**Debra WALKER, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants.**

**No. CA 3-85-1210-R.**

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 4, 1989.

Revised Sept. 22, 1989.

Michael M. Daniel, Elizabeth K. Julian, and Kenneth L. Schorr, North Central Texas Legal Services, Inc., Dallas, Tex., for plaintiffs.

Arthur Goldberg, Leslie K. Shedlin, Thomas H. Peebles, and Jonathan Strong, Dept. of Justice, Civ. Div., Washington, D.C., Joseph G. Werner, Haynes & Boone, Marvin Collins, U.S. Atty., and Donald W.

Hicks, Hill, Hicks & Collins, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

### WALKER II: THE FROST AMENDMENT AND THE ANTI–DEMOLITION STATUTE

BUCHMEYER, District Judge.

This opinion concerns a Consent Decree entered in a class action involving racial discrimination in low-income public housing in Dallas.[1] Only one part of the Decree is at issue: the demolition of many of the vacant and uninhabitable housing units at DHA's West Dallas project[2]—and the "one-for-one" replacement of these units by HUD with § 8 certificates and vouchers. This opinion[3] holds:

(i) the Frost Amendment,[4] which purports to prohibit the use of federal funds for the demolition of any of the housing at West Dallas—as required by the Consent Decree approved by the Court in this case—is unconstitutional because it violates the principle of separation of powers;

(ii) the Anti–Demolition Statute,[5] a general statute which prohibits the demolition of any public housing unless it is replaced by either § 8 certificates or other housing units *which will be available for at least 15 years*, is not unconstitutional;

(iii) the Anti–Demolition Statute *does not* apply to the demolition of 450 units at West Dallas which were *effectively replaced by § 8 certificates* before the date of this statute (Feb. 5, 1988);[6]

(iv) the Anti–Demolition Statute *does not* apply to those additional units at West Dallas that were *effectively replaced by § 8 vouchers used in non-minority areas* before Feb. 5, 1988, the date of this statute;

(v) the Anti–Demolition Statute *does apply* to all other housing at West Dallas—including those units that were not effectively replaced by § 8 vouchers before Feb. 8, 1988—so the Consent Decree must be modified to prevent the demolition of these units unless they are replaced with housing or § 8 assistance which meets the requirements of the Anti–Demolition statute;[7] and

1. The parties are the plaintiff class ("plaintiffs"), the Dallas Housing Authority (DHA), and the United States Department of Housing and Urban Development ("HUD"). This opinion (originally filed Aug. 4, 1989)—which constitutes the findings and conclusions required by Rule 52, Fed.R.Civ.P.—has been revised for publication by the deletion of those footnotes which only contained references to exhibits and testimony in support of various findings of fact.

2. Including some 1300 units that have been vacant and boarded-up for over 10 years because they are not fit for humans.

3. Two companion opinions are being released at the same time. They are "*Walker I:* DHA Violations of the Consent Decree and Appointment of a Special Master" and "*Walker III:* Joinder of the City of Dallas as a Defendant Subject to the Consent Decree," and they will be cited in this opinion as "*Walker I*" and "*Walker III.*" The Consent Decree is published as *Appendix A* to *Walker I*.

4. The Frost Amendment was part of the 1988 HUD appropriations act: Pub.L. No. 100–202, 101 Stat. 1329, 1329–213. It was passed on Dec. 22, 1987, and became effective on the same day when it was signed by the President.

5. The Anti–Demolition Statute, 42 U.S.C. § 1437p, was part of the Housing & Community Development Act of 1987, Pub.L. No. 100–242, 101 Stat. 1815, 1937–39. It was passed on Dec. 21, 1987 and became effective when it was signed on Feb. 5, 1988.

6. As discussed below, although these 450 § 8 certificates were allocated to DHA on May 21, 1987, *under the Consent Decree,* these certificates did not become *effective replacements* for housing to be demolished until *July 23, 1987*—when HUD approved the 120% "fair market rent" exception for these certificates. See this Court's opinion in *Walker I,* 734 F.Supp. 1231 at 1239–1240.

7. As discussed below, although HUD allocated 450 § 8 vouchers to DHA on March 30, 1987, and allocated another 435 § 8 vouchers on Sept. 30, 1987, *under the Consent Decree,* many of these § 8 vouchers did not become *effective replacements* for housing to be demolished until *August 31, 1988*—when HUD approved the 120% "fair market rent" exception for these vouchers. See this Court's opinion in *Walker I,* pp. 1239–1240. However, since one central purpose of the Consent Decree was to permit black families to move to non-impacted areas with the use of § 8 assistance, any § 8 vouchers that were actu-

(vi) the Anti–Demolition Statute *does apply* to the housing at West Dallas which is being replaced by the 100 units of new low-rent public housing ("LRPH") being constructed at *Country Creek,* but it is undisputed that these 100 units do meet the requirements of § 1437p.[8]

This means that demolition at West Dallas may proceed—*in accordance with this Court's approval of the Consent Decree*—with respect to (i) the 550 housing units replaced by § 8 certificates and the 100 LRPH units, and (ii) those additional units that were effectively replaced by § 8 vouchers in use in non-minority areas before Feb. 8, 1988. It also means that no other housing may be demolished at West Dallas unless it is replaced with § 8 assistance or actual "dwelling units" which will be available for at least 15 years.

To show the reasons for these decisions, this opinion will discuss (i) the factual background, (ii) the applicable law, (iii) the Frost Amendment, (iv) the Anti–Demolition Statute, and (v) the Modification of the Consent Decree.

### I. The Factual Background

The complete procedural history of this action—both before and after the plaintiffs, DHA and HUD settled the case with a Consent Decree approved by the Court on Jan. 20, 1987—is detailed in the *Walker I* opinion. However, these additional facts are necessary to show the factual background for this opinion.

### 1. The Legacy of Deliberate Segregation

As discussed in *Walker III*—"Deliberate Segregation in Public Housing by DHA and by the City of Dallas"—the primary purpose of DHA's public housing program was to prevent blacks from moving into the white areas of this city. And, this policy of

relentless, unbroken discrimination succeeded; for example, when this suit was filed in 1985:

(i) DHA had 12 public housing projects for low-income *families* that were 90–95% black;

(ii) DHA's other two *family* projects were 99% (*Little Mexico*) and 82% (*Cedar Springs*) Hispanic *and* black;

(iii) DHA had 6 low-income projects for the *elderly* which—because DHA intentionally assigned most elderly whites to "white projects" and most elderly blacks to "black projects"—were predominately one-race public housing projects.[9]

In addition, the § 8 Moderate Rehabilitation Program operated by DHA and the City of Dallas had a 90.6% black occupancy rate, with projects being located only in minority and low-income areas—and DHA's § 8 rent subsidy program was deliberately operated in a manner to prohibit most low-income black tenants from moving into non-minority areas with § 8 assistance. See the *Walker III* opinion, 734 F.Supp. 1289 at 1293–1309.

But the most inexcusable legacy of the deliberate discrimination in public housing by DHA and the City of Dallas was the 3500 unit West Dallas project. Constructed in the 1950s as a solution to "the Negro Housing Problem"—admittedly to prevent blacks from moving into white areas— West Dallas, by 1986, was a "publicly owned slum" and a "gigantic monument to segregation and neglect."[10] As described in *Walker III:*

"Because of the appalling conditions at West Dallas—housing that was barely fit to live in; almost 1300 vacant units that were boarded up; severe problems with drug dealers, with other crimes, with

---

ally in use in non-minority areas before Feb. 8, 1988 would, in fact, be *effective replacements* under the Decree.

**8.** These 100 units are "15–year project based" assistance under the Anti–Demolition Statute, 42 U.S.C. § 1437p(b)(3)(A). The plaintiffs do not contest this. See this Court's Order of Nov. 15, 1988 (which, in essence, approved the demolition of 100 units at West Dallas and deferred "decision with respect to the remaining 1335

units" replaced by § 8 certificates and vouchers).

**9.** The black elderly project (*Park Manor*) was 93% black, and the other elderly "white" projects were from 5% to 20% black in 1985.

**10.** See the discussion in *Walker III* of "The West Dallas Project (1975–1988: A Gigantic Monument to Segregation and Neglect."

transients, and with vandalism; health risks due to lead contamination; a bitter life with roaches and rats and rubbish; and little or no hope that these things would change—people in need were refusing to accept housing in the West Dallas project. In 1986, the rejection rates for *George Loving, Edgar Ward and Elmer Scott* ranged from 58% to 60%; and, this was true even though the DHA staff had been instructed to deny any housing assistance to a family that refused to take a unit in West Dallas.[11]

"And, because of the same horrible conditions, a substantial number of the West Dallas tenants wanted to get out of the project. Evidence at the Dec. 12, 1986 fairness hearing established that as many as 85% of the tenants at West Dallas wanted to move out of the "publicly-owned slums" and that from 15–20% of the tenants left West Dallas *each* year...." (*Walker III*, pp. 1307–1308).

In January of 1987, there were 1,917 black families being subjected to these horrible conditions at West Dallas. And, it was not surprising that the remaining 1,583 units of the 3500 at West Dallas were vacant—that almost 1300 of these had been boarded up for at least ten years because they were not fit to be occupied by humans (*Walker III*, p. 1308)—and that no one was willing to make the massive investment (more than $65 million) that would be required just to restore the 3500 units at West Dallas to minimum standards of habitability.

## 2. The Settlement

After this suit was filed in 1985, a number of factors influenced each party's attitude toward settlement:

(i) *HUD* planned to require DHA to demolish at least 1300 vacant units at West Dallas. When this was done, HUD would cease the $1.2–1.5 million "operating subsidy" which it was paying to DHA on these vacant units. And, HUD was refusing to release $18 million to DHA for the renovation of *some* units at West Dallas unless DHA could submit a workable plan to restore both the project and the surrounding neighborhood.

(ii) *The plaintiffs* had no right, under the law, to stop the demolition of the 1300 West Dallas units—or to force HUD to replace them with other housing or § 8 assistance. And, renovation of the West Dallas units—even if money were available—would do nothing to give class members an opportunity for housing in a non-minority area or to improve the quality of the public housing in DHA's projects and § 8 programs.[12]

(iii) DHA was faced with a loss of from $1.2–1.5 million each year when the 1300 units at West Dallas were demolished. It was also—because of the undisputed facts concerning its deliberate segregation and discrimination in public housing—facing an obvious loss in this lawsuit. See *Walker III*, pp. 1293–1310.

It was under these circumstances that the parties—after prolonged and often-heated negotiations—reached a settlement. The Consent Decree contained significant remedial provisions that were designed: to stop DHA's practices of discrimination (e.g., *tenant assignment & selection*); to insure that § 8 participants would have needed assistance in locating housing of their choice throughout Dallas County, especially outside of minority areas (e.g., *housing mobility services*); to use the § 8 assistance to give low-income blacks a real opportunity to move into non-impacted areas (e.g., *120% fair market rent exception*); to improve the quality of DHA's present *and* future housing (e.g., *inspections and code enforcement*); and to insure that § 8 tenants had the opportunity

---

**11.** On March 25, 1988, DHA began offering West Dallas units to new applicants on a voluntary basis; however, from that date until Oct. 31, 1988, only 21 persons out of 1000 applicants (2.1%) chose to move into West Dallas.

**12.** Obviously, if all the 3500 units at West Dallas were rehabilitated, this would mean that several thousand members of the plaintiff class would not have any choice for low-income housing but *black housing in a black neighborhood.* And, renovation of these units—without any improvement in the surrounding neighborhood—would only defer the West Dallas problem for a few years.

to move if their units did not comply with housing quality standards.[13] And, as to the West Dallas project, the Decree provided:

> (i) that from 800–900 units at West Dallas would be rehabilitated with the $18 million to be released by HUD;

> (ii) that 1000 West Dallas units were to be demolished, but replaced by 100 units of new low-rent public housing and 900 § 8 certificates and vouchers;

> (iii) that HUD could require the demolition of other units at West Dallas only by replacing them on a one-for-one basis with additional § 8 certificates or vouchers.

### 3. Approval of the Decree

On December 12, 1986—after proper notice had been given to members of the putative class [14]—a fairness hearing was held on the proposed settlement. Testimony and exhibits were presented in support of the proposed Consent Decree; this Court heard both oral and written objections *from everyone* who wanted to comment about the Decree.

There were a few minor (often erroneous) objections. But there were none to those parts of the Decree which were intended to improve the quality of housing occupied by DHA tenants, to provide an opportunity for persons to move out of minority areas into non-impacted areas in Dallas and its suburbs, and to prevent DHA from discriminating against people on the basis of race. Indeed, *the only serious objection was to the demolition—but not the renovation—of units in West Dallas.*

On January 9, 1987, this Court announced the approval of the Consent Decree in open court—taking pains to address each objection that had been made, including the minor ones:

> (i) The *"We don't want to be forced to leave West Dallas"* objection: "I am concerned about some of the statements that have been reported in the press following the last hearing [Dec. 12, 1986]. And I, at that hearing, stated very clearly that *no resident of the West Dallas Project will have to leave if they do not want to.* If that's not clear enough, I will tell you again: no one who lives at the West Dallas Project will be forced to move. No one will be forced to move out of the West Dallas Project until housing is available for them." [15]

> " . . . .

> "Now, right now, 2200 units approximately are occupied. Once the vacant units are destroyed there are still 2200 units for people to live in. And if 2200 people want to stay at the West Dallas Project then not a single other unit will be destroyed at the West Dallas Project." (Jan. 9, 1987 Hearing: Tr. 7, 11).[16]

> (ii) The *"We want you to approve the Decree without any demolition at West Dallas"* objection: "the chairman of the Committee to Save Public Housing testified there would be no objection to this settlement if the provisions concerning demolition of the 2600 units at West Dallas were deleted. There will be no settlement if those provisions are deleted. There would only be a trial." (Jan. 9, 1987 Hearing: Tr. 8).[17]

---

**13.** These, and other significant portions of the Decree, are discussed in *"Walker I:* DHA Violations of the Consent Decree and Appointment of a Special Master."

**14.** See *Walker v. City of Mesquite,* 858 F.2d 1071, 1072–73 (5th Cir.1988).

**15.** At the very most, there were only 500 families at West Dallas who expressed opposition to the Decree because they did not want to move. Obviously, these families would be accommodated by the 800–900 units to be renovated at West Dallas under the Decree. Dec. 12, 1986 Hearing: Tr. 6, 10.

**16.** These figures were based upon the evidence at the Dec. 12, 1986 fairness hearing. However, 2200 people did not want to stay in West Dallas; by January 20, 1987, when the Consent Decree was entered, there were only 1971 families residing at West Dallas. *Walker III,* p. 1308. *Over 200 families had left West Dallas in one month.*

**17.** At the Dec. 12, 1986 fairness hearing, the HUD attorney—in response to the Court's question about what would happen "if I approve the settlement with the exception of demolition of any units in West Dallas?"—*emphatically* responded that there would be no settlement be-

(iii) The *"It's wrong to destroy any public housing in Dallas"* objection: "Number 4 is the general objection: 'Do not destroy any public housing. There is an acute housing crisis in Dallas. There are thousands of homeless people.' The argument is that it is wrong to destroy the 1300 vacant units immediately, but it's wrong to replace another 1300 units with § 8 vouchers and then demolish them. [But] it is really not correct to say that this settlement is responsible for destroying 2600 units of public housing. 1300 units would be destroyed whether this settlement is approved or not. Those units are not fit for habitation. And under the evidence presented to me, they're not going to receive any funds from DHA or HUD to modernize those units. They're boarded up, they're vacant. *They have been effectively demolished by neglect and delay for a number of years.*

... Unfortunately, the presence of a public housing unit is not a guarantee that that house is going to be a place that somebody can live in, some place that is decent and safe and sanitary and the 1300 units in West Dallas demonstrate this." (Jan. 9, 1987 Hearing: Tr. 13, 15).

(iv) The *"This is just another Washington Place"* objection: "And, objection is made that there's no place in the City of Dallas for the 100 promised units of new housing. The objection was that *Washington Place* was demolished and that it has not been replaced. As of the date of the [Dec. 12, 1986] hearing, a location had been found for the replacement units for *Washington Place.* And as DHA itself conceded, it took much too long to replace the units that were lost when *Washington Place* was destroyed.

"This is not *Washington Place.* Under the Settlement Agreement, this Court has control over when the site will be located, 6 months, from the date the settlement is approved, and when the site

will be operating. That's within two years after the settlement is approved. If you do not think that I will enforce those provisions, then I will suggest that you do not know me." (Jan. 9, 1987 Hearing: Tr. 14–15).

(v) The *"We think § 8 assistance is unreliable"* objection: "There's another objection that the § 8 rent vouchers and certificates have limitations. They're rent subsidies. The objection is that people using them will be in difficult straights in a few years if the real estate market changes, if landlords decide they can get more money than is available in a § 8 program.... There is validity, some validity to that objection.

"However ... the people who live in West Dallas ... [who] do not want to take a § 8 certificate ... should stay in the West Dallas Project because the Settlement Agreement gives them priority to move to any other DHA public housing units in Dallas. So those who think there is too much risk in a § 8 program, stay, stay until you can move into another Dallas Housing Authority project. [But] if you want to stay [in West Dallas], you cannot be forced to move....

"The demolition [under the Decree] would take approximately 5 years. It should be obvious to anyone that, if the claim that the § 8 program will not work is a valid one, we'll learn that very shortly. If there are not § 8 units available for people to move into, the Plaintiffs' attorneys are going to be back before me asking me to stop the demolition and that will be done. *But if the § 8 program contemplated by the Settlement Agreement works, then it would disburse low income housing throughout Dallas County rather than warehousing people in 3500 dilapidated units and decaying units in West Dallas that need renovation."* (Jan. 9, 1987 Hearing: Tr. 12–14).[18]

cause "West Dallas costs HUD a lot of money every year. We have been paying operating subsidies for vacant units for years and years and had there not been a change in the law would continue paying that with those vacan-

cies there. We don't believe [that West Dallas] is a viable project." Dec. 12, 1986 Hearing: Tr. 244–245.

**18.** DHA applicants were not that concerned with the risk in using § 8 assistance. In August

(vi) The *"Give us time to come up with alternatives"* objection: "I have several requests for a delay for more time for study and for more time for alternatives to be developed. The requests are sincere. They want delay for the demolition to stop it, so alternatives can be developed. As I've indicated, even if I delayed we're looking at demolition of 1300 units. ... Unfortunately there's no lack of ideas as to what to do about public housing. There is a lack of money. For me to delay would penalize every person who lives in public housing in the City of Dallas, every person, because there are incredible benefits to the entire class under this Settlement Agreement.... For me to delay approval of the Settlement Agreement would also penalize those persons who want to stay at West Dallas, because if the settlement is not approved there will be no renovation. There's not going to be better housing for the poor." (Jan. 9, 1987 Hearing: pp. 20–21).

*Over two and one-half years have passed since the approval of the Consent Decree—and not a single, viable "alternative" to the Decree has been presented to this Court.* There have been no offers from Washington for the $88 million (or more) that it would take to even begin to rehabilitate West Dallas *and* its surrounding neighborhood.[19] And, of course, neither the City of Dallas nor any private source has been willing to commit any money to help remedy the legacy of segregation in West Dallas.

Two additional points should be emphasized about this Court's approval of the Consent Decree. The proposed Consent Decree recognized that DHA was in need of substantial resources from other "institutions and organizations" in order to comply with its obligations under the Decree.[20] This Court would not have approved the Consent Decree if the City of Dallas (through its Mayor) had not promised to support the settlement and assist DHA to comply with the Decree. *Walker III,* pp. 1309–1311.

Similarly, this Court would not have approved the Decree if HUD was going to stop paying DHA the $1.2–1.5 million "operating subsidy" before the vacant units in West Dallas had been demolished. Since DHA has no power to levy taxes, its ability to comply with the Decree would have been virtually impossible without the operating subsidy from HUD.[21] Indeed, this is particularly true in light of the fact that DHA had no binding agreement[22] with HUD for

---

of 1986, there were 2700 people on the DHA waiting list for § 8 vouchers and certificates—but there were only 650 people on the waiting list for housing at a DHA project.

**19.** As indicated in *Walker III,* the cost of renovating *only* the 3500 units at West Dallas was estimated at $47.8 million in 1980, and at $65 million at the Dec. 12, 1986 fairness hearing. The cost of rehabilitating *both* the West Dallas units and the surrounding neighborhood was estimated at $88 million in 1983, although this plan proposed a reduction in the number of units at West Dallas. *Walker III,* pp. 1308, 1312 at fn. 75.

**20.** "The parties enter into this Decree on the explicit premise that the resources currently available to DHA to implement the Decree are inadequate. In order to implement the Decree, substantial resources will have to be made available from institutions and organizations other than DHA." Consent Decree, p. 2.

**21.** Indeed, as described in *Walker I,* HUD's attempt to stop the payment of this operating subsidy in August of 1988, resulted in some immediate violations of the Consent Decree by DHA—including the dismantling of its Housing Mobility Division required by the Decree. *Walker I,* pp. 1233–1234, 1236–1237.

**22.** DHA and HUD are in disagreement over this point. *HUD is correct:* There is nothing in the Consent Decree that *requires* the use of HUD funds for the West Dallas demolition; and, the HUD promise that it would "consider" DHA's request for demolition funds did not constitute a binding agreement. However, *DHA is also correct to this extent:* It is undisputed that all parties understood that HUD would grant DHA's application for demolition funds; and, in fact, HUD approved DHA's West Dallas demolition plan on May 20, 1987, and reserved $2.1 million in funding for this demolition by DHA. HUD's Response to DHA's Motion for Clarification of Frost Amendment (filed Dec. 30, 1988), pp. 1–2. Accordingly, this Court *would not* have approved the Consent Decree if all parties had not expected that—although there was no "binding agreement" or "guaranty"—HUD would provide funds for the West Dallas demolition as part of the "substantial resources" that DHA needed from other "institutions and organizations" under the Consent Decree.

the funding that that would be required for the demolition of the units at West Dallas.

### 4. The Frost Amendment and The Anti-Demolition Statute

On Dec. 22, 1987, the Frost Amendment was passed as part of the 1988 HUD appropriations act, and it became effective that same day. Pub.L. No. 100–202, 101 Stat. 1329–213. It prohibits the use of HUD funds for any demolition at any of the three apartment complexes at the West Dallas project:

"None of the funds appropriated by this Act or any other Act for any fiscal year shall be used for demolishing *George Loving Place*, at 3320 Rupert Street, *Edgar Ward Place*, at 3901 Holystone, *Elmer Scott Place*, at 2600 Morris, in Dallas, Texas, ..."

On Dec. 21, 1987, Congress passed the "Anti–Demolition" statute, 42 U.S.C. § 1437p, as part of the Housing & Community Development Act of 1987. Pub.L. No. 100–242, 101 Stat. 1851, 1937–39. This statute requires in substance, that replacement units for public housing which is demolished must be "project-based" units for which at least 15 years of assistance are available—or, if § 8 certificates are to be used as replacement housing,[23] there must be a sufficient supply of housing actually available for those who want to use the certificates, and this supply must be "likely to remain available" for 15 years. § 8 vouchers may not be used at all as replacement units under the Anti–Demolition Statute. 42 U.S.C. 1437p(b)(3)(A), (B).

These two statutes delayed any demolition of the vacant, uninhabitable units at West Dallas under the Consent Decree.

### 5. The Consent Decree (Jan. 1987–June 1989)

HUD reserved 450 § 8 certificates and 450 § 8 vouchers for DHA on Sept. 30, 1986. On March 30, 1987, HUD authorized DHA to begin using the § 8 vouchers, and on May 21, 1987 HUD authorized use of the § 8 certificates. Then, on Sept. 30, 1987, HUD approved DHA's application for an additional 435 § 8 vouchers bringing the total to 450 § 8 certificates and 885 § 8 vouchers. On April 1, 1988, HUD approved DHA's proposal for the 100 new units of LRPH at *Country Creek*.

However, because of Frost Amendment (which became effective on *Dec. 22, 1987*) and the Anti–Demolition Statute (*which became effective on Feb. 8, 1988*), no units were demolished at West Dallas during the first two and one-half years of the Consent Decree. Despite this—and despite repeated and pervasive violations of the Consent Decree by DHA from Feb. 1987 through Dec. 1988 (see the *Walker II* opinion)—DHA had substantially completed the rehabilitation of 449 units at *Elmer Scott* and 345 units at *Edgar Ward* by April 19, 1989.

After a dismal performance in the use of § 8 assistance during the first year of the decree (see *Walker I*, pp. 1239–1242), by June 30, 1989, DHA had 5,435 § 8 units in use—and approximately 45% of these (2465) had been used to move black families into non-impacted areas in Dallas (2,050) and in the suburbs (415).

Of the 1917 black families who were at West Dallas when the Consent Decree was approved, 598 moved out of West Dallas during the first year of the Decree—and 231 of these relocated with the use of § 8 assistance. In addition, the rejection rate for the West Dallas project rose from 50–60% in 1986 to almost 98% during a seven-month period ending Oct. 31, 1988. By June 30, 1989, there were only 1072 families at West Dallas—and the number of families who want to stay in West Dallas seems to have stabilized between 1000–1075.[24]

However, if the Frost Amendment is valid, then it would frustrate the Consent Decree by effectively prohibiting any demolition in West Dallas—since DHA has no

---

23. § 8 certificates may be used only "after a finding by the Secretary [HUD] that replacement [of the demolished units] with project-based assistance is not feasible."

24. See *Walker III*, p. 1308 at fn. 62, p. 1311 at fn. 68; DHA Report No. 7 (July 20, 1989), Exh. 2.

money to pay for this demolition.[25] In that event, the parties would, no doubt, accuse each other of various breaches of the Decree; and, this Court would have to decide whether to modify the Decree in some manner—or whether to vacate the Decree and set this case for trial.

As to the Anti–Demolition Statute, its effect upon the Consent Decree would not be as drastic. HUD contends that it does not apply at all to the 1335 § 8 vouchers and certificates which it has allocated to DHA—and that it has a vested right to require the demolition of this number of units (1335) at West Dallas in accordance with the Decree. In response, the plaintiffs claim that the Anti–Demolition Statute does apply—and that HUD must replace all of the 1335 § 8 units with 15–year "project-based" or § 8 assistance, as required by § 1437p.[26]

## II. The Applicable Law

### 1. Separation of Powers

Federal courts have consistently "given voice to, and ... reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, —, 109 S.Ct. 647, at 658–59, 102 L.Ed.2d 714, at 735–36 (1989); *INS v. Chadha*, 462 U.S. 919, at 951–52, 103 S.Ct. 2764, at 2784–85, 77 L.Ed.2d 317 (1983).

However, the principle of separation of powers does not require that the "three Branches must be entirely separate and distinct." *Mistretta*, 488 U.S. at —, 109 S.Ct. at 658, 102 L.Ed.2d at 736. Instead, courts must use a "pragmatic, flexible approach" which focuses on "the proper bal-

ance between the coordinate branches." See, e.g., *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977); *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (adopting Madison's flexible approach to separation of powers).

■ Under this approach, it is clear that Congress *may not* interfere with a court's ability to adjudicate a pending case. See *United States v. Klein*, 80 U.S. (Wall.) 128, 20 L.Ed. 519 (1872); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855); *In re Washington Public Power Supply System Securities Litigation*, 673 F.Supp. 411, 414–16 (W.D.Wash.1987). As explained in *National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455 (D.C.Cir. 1984):

"In *U.S. v. Sioux Nation of Indians*, the Supreme Court noted two important features of the *Klein* holding: that Congress was mandating a result in favor of the federal government in a particular pending case and that Congress was attempting to dictate the rule of decision in the case. See 448 U.S. [371] at 405, 100 S.Ct. [2716] at 2735 [65 L.Ed.2d 844 (1980) ]. Commentators have urged that *Klein* stands for the propositions that Congress may not dictate how a court should decide a question of fact in a particular case and that Congress may not "bind the Court to decide a case in accordance with a rule of law independently unconstitutional on other grounds[.]" *P. Bator, P. Mishkin, D. Shapiro & H. Wechsler*, supra, at 316." [27]

---

**25.** Although DHA has some additional sources (see *Walker I*, pp. 1235–1236 at fn. 24), this Court *would not* permit the *Washington Place* funds to be used for any other purposes besides those specified in the settlement in that case. See *Walker III*, pp. 1301–1303. The other two sources—*Mustang Village* fund ($130,000 on 9/1/87) and the *Lake West* settlement ($684,000 on 9/1/87)—would not be enough to pay for the demolition (particularly since DHA *should* have spent substantial amounts of this fund

since Sept. 1987 in complying with the requirements of the Consent Decree). *Walker I*, pp. 1234–1236.

**26.** The "truth," as usual, may lie Somewhere in Between.

**27.** See also Marc N. Garber and Kurt A. Wimmer, *"Presidential Signing Statements as Interpretations of Legislative Intent: An Executive Aggrandizement of Power,"* 24 Harv.J. on Legis. 363 (Summer 1987).

Accord: *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980) (The "appropriations proviso" passed by Congress in *Klein* was unconstitutional because "it prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the courts to decide a controversy in the Government's favor." (448 U.S. at 404, 100 S.Ct. at 2735, 65 L.Ed.2d at 868).

■ In contrast, the separation of powers doctrine does not prohibit Congress from changing the law generally—even if that change applies to cases which are pending in the trial courts or on appeal. As held in *Juvenile Law Center, Inc. v. Regnery,* 738 F.2d at 465:

"Appellee's reliance on the broad language in *Klein* is entirely misplaced. Pending cases are often affected by the actions of coordinate branches of government. For instance, the general rule is that, if Congress changes the law while a case is pending, the courts are obligated to apply the law as they find it at the time of judgment (including appellate judgment). See, e.g., *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801) ... Thus, *Klein* could not possibly stand for the proposition that *any* attempt by the other branches to affect pending cases is unconstitutional...."

Accord: *United States v. Sioux Nation of Indians,* 448 U.S. at 404–08, 100 S.Ct. at 2735–37, 65 L.Ed.2d at 869–71; *Pope v. United States,* 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3 (1944); *In re Consol. U.S. Atmospheric Testing Litigation,* 820 F.2d 982, 992 (9th Cir.1987); *United States v. Brainer,* 691 F.2d 691, 697–98 (4th Cir.1982).

Similarly, in *Temple University v. United States,* 769 F.2d 126 (3rd Cir.1985), the court stated:

"The plaintiff, in addition to its main arguments, alleges that Congress, in the 1984 Act, violated the separation of powers doctrine by prescribing a rule of decision in a pending case. See *United States v. Klein,* 80 U.S. (13 Wall.) 128,

148, 20 L.Ed. 519 (1871); *United States v. Sioux Nation of Indians,* 448 U.S. 371, 404, 100 S.Ct. 2716, 2735, 65 L.Ed.2d 844 (1979). This arguments is without merit. *Congress did not desire to effect a rule of decision only in a particular case* (for example, by taking away jurisdiction, as in *Klein* ). *Instead, Congress changed the tax law generally.* To be sure, the congressional change has rather broad application, applying as it does even to non-litigating taxpayers." (769 F.2d at 134, fn. 4) (emphasis added).[28]

## 2. The Modification of a Consent Decree

■ The power to modify a Consent Decree is inherent in the decree itself—and is a matter for the discretion of the Court. *Ruiz v. Lynaugh,* 811 F.2d 856, 861 (5th Cir.1987); *Nicol v. Gulf Fleet Supply Vessels, Inc.,* 743 F.2d 298, 299 fn. 2 (5th Cir.1984); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 928 (5th Cir. 1983).

■ A change in the applicable law is one of the circumstances that may justify the modification of a Consent Decree. *Lelsz v. Kavanagh,* 807 F.2d 1243, 1254 (5th Cir.1987); *System Federation # 91 v. Wright,* 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). A court "cannot be required to disregard significant changes in law or facts if it is 'satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.' " *Id.,* quoting in part *U.S. v. Swift & Co.,* 286 U.S. 106, 114–115, 52 S.Ct. 460, 462–463, 76 L.Ed. 999 (1932). Instead, a "balance must be struck between the policies of *res judicata* and the right of the court to apply modified measures to changed circumstances." *Wright,* 364 U.S. at 647–48, 81 S.Ct. at 372.

## III. The Frost Amendment

■ The Frost Amendment is a blatant attempt by Congress to interfere with the ability of this Court to adjudicate a pending

**28.** See also *Max M. v. Illinois State Board of Education,* 684 F.Supp. 514, 520 (N.D.Ill.1988);

*Capello v. District of Columbia Board of Education,* 669 F.Supp. 14, 18 (D.D.C.1987).

case—and to try to reach a just result in light of the competing interests of *all* the parties (not just vocal opposition from an unusual combination of diverse groups).[29]

This is clear from the language of the amendment itself; it purports to deny any federal funding for the demolition of vacant and uninhabitable units at West Dallas that was approved in the Consent Decree. It is also clear from the legislative history of the Frost Amendment. For example, Representative Martin Frost (D.Dallas)—speaking in support of his own amendment (which had not a single hearing before any Congressional committee)—made these comments:

> "I'd like to give you a little history of the situation in Dallas. Several years ago, a lawsuit [*Walker v. HUD*] was filed seeking to desegregate public housing in Dallas....
>
> "... HUD then seized on the existence of the law suit ... to pressure the local housing authority to seek a settlement of the entire discrimination lawsuit, with the focal point being the demolition of over 2,600 units of public housing in West Dallas....
>
> "The local housing authority and the plaintiffs then agreed to HUD's terms, and a consent decree was entered into by a Federal district judge [*Jerry Buchmeyer*] in Dallas incorporating the settlement ...
>
> "*What we have is a cynical action by the Reagan administration* to eliminate one-third of the public housing units in Dallas at a time when the problem of the homeless is increasing and at a time when there is an increasing number of poor people in the seventh largest city in

the United States." Cong.Rec.—House, pp. 7741, 7774 (Sept. 22, 1987).

See also Cong.Rec.—House, p. 7743 (Sept. 22, 1987) (Rep. Frost: "The plaintiffs in the lawsuit [*Walker v. HUD*] did not seek demolition of the West Dallas housing projects. *HUD*, because it did not want to provide funds to remodel those projects, *forced upon the plaintiffs* in the lawsuit and upon the Dallas Housing Authority *a scheme to demolish these units.*"

The comments of others at this debate also make it obvious that the only purpose of the Frost Amendment was to interfere with the lawsuit pending before this Court.[30] For example, Representative Wylie (R–Ohio) ("In my view, it would be wrong for us here, in effect, to overrule that settlement" in *Walker v. HUD*) and Representative Roukema (N.J.) ("This issue in Dallas originally arose out of a segregation suit and culminated earlier this year in a consent decree ... After all that, it would be outrageous for the Congress to step in at this late date and upset the apple cart"). And, after specifically referring to this lawsuit, Rep. Steve Bartlett (R.-Dallas) stated:

> "... in the case of Dallas it would negate a desegregation court order that provided for more than 1–for–1 replacement since it would replace with certificates and vouchers those units of public housing that are so dilapidated as to be also vacant." [31]

Now, after having quoted *and studied* his remarks ... this Court is confident that Representative Martin Frost, by his comments on the floor of the House, did not mean to imply that the "federal district judge in Dallas" was so incompetent that

---

**29.** Some groups objected to the West Dallas demolition—but not to any other part of the Consent Decree—for obviously political reasons, such as the loss of votes or a power base if blacks were moved out of West Dallas. Other groups sincerely objected to the demolition of any public housing. Still others were sincere in wanting the West Dallas demolition delayed, to see "if there were any alternative solutions." *But some groups objected to the attempted desegregation of public housing in Dallas;* they suddenly discovered how important it was to keep 3500 units of low-income housing for blacks in West Dallas (even though they had not been

concerned with the 1300 units that had been vacant and boarded-up for over ten years).

**30.** So did the prepared statement which was presented by the District Director for Representative Frost at the Dec. 12, 1986 fairness hearing; in it, Representative Frost stated: "I have the highest regard for the Court ... but given the Court's Order, *I have no choice but to seek a legislative remedy to prevent the demolition in West Dallas.*"

**31.** Cong.Rec.-House, pp. 7743–7744, 7752–7753, 7776–7778 (Sept. 22, 1987).

he could not detect a sinister "scheme" being "forced upon the plaintiffs" by HUD ... nor did he mean to impugn that judge's motives in approving the Consent Decree after a fairness hearing (and full consideration of the interests of all parties) ... nor did he mean to belittle that judge's concerns for minorities, for the poor, and for the homeless ... and that he certainly did not mean to mistakenly attribute that judge's appointment to the "cynical action of the Reagan administration."

 Those things being true, this Court need say nothing further about this issue—except that *the Frost Amendment was a deliberate attempt to interfere with a case pending before this Court. Therefore, it is unconstitutional* because it violates the doctrine of separation of powers. *United States v. Klein*, 80 U.S. (Wall.) 128; *National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455; *Resident Advisory Board v. Rizzo*, 463 F.Supp. 694, 200 (E.D. Pa.1979), affirmed, 595 F.2d 1211, 1214 (3rd Cir.1979).[32]

### IV. The Anti–Demolition Statute

At the time the Consent Decree was approved, there was no requirement for a "one-for-one" replacement as a condition for the demolition of public housing. 42 U.S.C. § 1437p did require the relocation of residents who were displaced by demolition, but this could be done with the use of § 8 certificates or vouchers. Accordingly, the Decree provided that the "one-for-one" replacement of the West Dallas units to be demolished would be accomplished with the use of § 8 certificates and vouchers and the 100 units of new LRPH construction.

However, the Anti–Demolition Statute, 42 U.S.C. § 1437p, now requires—in the event of demolition of public housing—"one-for-one" replacement of units to be demolished, by project-based assistance that has at least a 15 year contract term. § 8 vouchers may not be used as replacement units; and, the use of § 8 certificates is permissible only if there is a substantial probability that this § 8 housing will be available at least 15 years.

### 1. The Statute Is Constitutional

██ Obviously, the Anti–Demolition Statute is a general change in the law. Unlike the Frost Amendment, it is not an attempt to interfere with the Court's ability to adjudicate in this case. Therefore, the Anti–Demolition Statute is constitutionally sound even though it affects this case (and all other housing discrimination cases that may be pending). *United States v. Sioux Nation of Indians*, 448 U.S. at 404–08, 100 S.Ct. at 2735–37, 65 L.Ed.2d at 869–71; *Pope v. United States*, 323 U.S. 1, 65 S.Ct. 16); *National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455.

Despite technical arguments made by HUD, it is apparent that this statute, 42 U.S.C. § 1437p, was intended to apply retroactively to pending cases [33]—as well as to those which may result in the future from attempted demolition of public housing. This is supported to some degree by the scant legislative history:

**32.** The plaintiffs make several other attacks upon the Frost Amendment. First, they claim that it was repealed by the Anti–Demolition Statute; this Court disagrees because, from the legislative history, it seems clear that the understanding of the House members was that the provision for "1–for–1 replacements of units of public housing" under the Anti–Demolition Statute "would not be permitted to be used in West Dallas" because of the Frost Amendment. See Cong.Rec.-House, p. 7753 (Sept. 22, 1987) (Remarks of Rep. Bartlett). Second, they argue that the Frost Amendment is unconstitutional because it would, in this case, help perpetuate racial segregation in public housing; this Court again disagrees—*not with the claim that racial*

*segregation in public housing in Dallas would be perpetuated by the Frost Amendment*—but because the House debates clearly indicate that the supporters of the Frost Amendment were sincere, and were not acting for discriminatory reasons, in trying to prevent demolition of any public housing in Dallas (a decision reached without any consideration of the conflicting interests presented to this Court by the testimony and exhibits at the Dec. 12, 1986 fairness hearing).

**33.** For example, § 1437p would obviously apply in this case to the demolition of any units at West Dallas besides those covered by the 1435 units of § 8 certificates and vouchers and of new LRPH units which HUD has issued to DHA.

"The conference agreement also contains a provision clarifying that no [local housing authority] shall take any steps toward demolition and disposition without having satisfied the statutory criteria. This provision is intended to correct an erroneous interpretation of the existing statute by the United States Court of Appeals for the D.C. Circuit and shall be fully enforceable by tenants of and applicants for the housing that is threatened." (Conf. Report 100–426, 100th Congress, 1st Session, p. 172) (emphasis added).

However, this Court must still determine whether or not it would create a "manifest injustice" to apply the Anti–Demolition Statute to this case. *Bradley v. Richmond School Board*, 416 U.S. 696, 710–721, 94 S.Ct. 2006, 2015–21, 40 L.Ed.2d 476 (1974); *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 282–283, 89 S.Ct. 518, 526–527, 21 L.Ed.2d 474 (1969). And, this determination depends upon whether the application of § 1437p would deprive a party of some right that had matured, or that had become unconditional, under the Consent Decree. *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2020.[34]

## 2. Its Application In This Case

HUD claims that it has two different rights that became "matured or unconditional" under the Consent Decree before Feb. 8, 1988: (i) the demolition plan for West Dallas had been completed by DHA and approved by HUD on May 20, 1987, and (ii) HUD had already allocated 1435 assisted housing units to DHA—and the application of § 1437p would mean that "HUD would never realize the full *quid pro quo* it bargained for when it agreed to provide these units, i.e., demolition of an equal number of units in West Dallas."

### (i) The Demolition Plan

■ HUD has no vested rights by virtue of its approval of DHA's demolition plan for West Dallas. Indeed, the plaintiffs objected to this plan in their July 1, 1987 motion because "it violates the decree by seeking to demolish occupied and better quality units while leaving intact and unreplaced many of the historically vacant and uninhabitable units, thus removing more units from the inventory than have been replaced." Subsequently, the plaintiffs objected to the demolition plan on these grounds:

"The decree requires that each unit to be demolished be replaced on a one-for-one basis [paragraph 6C]. As plaintiffs' exhibits 9–11 make clear, the 1,435 units do not replace the units to be demolished on a one-for-one basis. HUD is seeking to replace 334 public housing one bedroom units with 420 certificates and vouchers while providing only 395 2–bedroom certificates and vouchers to replace 524 public housing 2–bedroom units."[35]

The Court has never resolved these objections to the demolition plan. Therefore, it is clear that any rights under the demolition plan for West Dallas had not become "matured or unconditional." Indeed, this Court approved the Consent Decree only on the condition that there would be no demolition in West Dallas until it was approved by the Court. This was stated several times at the Jan. 9, 1987 Hearing:

"If there are not Section 8 units available for people to move into, the plaintiffs' attorneys are going to be back before me asking me to stop the demolition and that will be done." (Tr. 14).

"If the Section 8 program is not working, if it does not work, then the program under this settlement agreement will be

---

**34.** This Court is aware that Judge Diamond, in *Tillman v. Pittsburgh Housing Authority*, CA No. 88–0311 (W.D.Pa.), issued a bench ruling on Feb. 17, 1988, that the Anti–Demolition Statute does not apply retroactively. See April 21 and Dec. 21, 1988 letters to this Court from the HUD attorneys. However, the demolition involved in that case had already received final approval and was scheduled for a date less than a month from the Feb. 17, 1988 hearing. Therefore, it would have been "manifestly unjust" to apply

§ 1437p in that case; indeed, Judge Diamond stated: "It would be absurd and unreasonable to apply the requirements of new law [effective Feb. 5, 1988] to demolitions that have already been commenced in compliance with the old law."

**35.** Plaintiffs' Response to HUD's 6D Motion, pp. 2–3 (Oct. 28, 1988).

stopped. There will be no further demolition." (Tr. 16).

"... Without this Settlement Agreement, I couldn't do anything to stop the sale or demolition of another unit in the city of Dallas. As the plaintiffs' attorneys well-know, they have given me power to enforce by contempt provision in the Settlement Agreement that there will not be any unit of public housing removed, or sold or demolished from the present housing that Dallas Housing Authority has until this Court approves it." (Tr. 21).

Statements similar to these were repeated by the Court at practically every hearing in this case.[36] Yet, contrary to its present argument that Court approval of the demolition plan is not required,[37] HUD never disagreed—and it certainly never appealed from this Court's determination that, under the Consent Decree, there would be no demolition at West Dallas without Court approval. Accordingly, HUD's approval of the DHA demolition plan on May 20, 1987 does not make it "manifestly unjust" to apply the Anti–Demolition Statute to this case.[38]

### (ii) The Allocation of § 8 Assistance

■■■ However, HUD's allocation of the § 8 assistance to DHA did vest it with some "matured and unconditional" rights under the Consent Decree. In return for these § 8 units, HUD bargained for and received the right to require DHA to demolish an equal number of units at West Dallas. (Decree Plan, 4). HUD cannot redistribute these § 8 units; indeed, most of them are in use by DHA tenants—since DHA had 5,435 § 8 certificates and vouchers in use on June 30, 1989. It is clear, therefore, that it would be "manifestly unjust" if the Anti–Demolition Statute were applied to prevent HUD from requiring the demolition of *some* housing at West Dallas—when the plaintiff class has received the benefits of these § 8 units.[39] But it is also clear that DHA did not have vested rights in *all* of the 1335 § 8 certificates and vouchers on *Feb. 8, 1988*, the effective date of the Anti–Demolition Statute, 42 U.S.C. § 1437p.

### (iii) The 450 § 8 Certificates

■■■ HUD allocated 450 § 8 certificates to DHA on May 21, 1987. However, as discussed in *Walker I*, pp. 1238–1239, the Consent Decree recognized that it would be difficult, if not impossible, to place an adequate number of § 8 assisted units in non-impacted areas of Dallas and its suburbs unless HUD approved the 120% fair market rent exception for these units. (Decree Plan III, 10). Until this was done, therefore, HUD had not provided a "one-for-one" replacement as required by the Decree.[40]

On July 23, 1987, HUD approved the use of the 120% rent exception for § 8 certificates in Dallas and its suburbs. See *Walker I*, pp. 1238–1239. This made all 450 § 8

---

**36.** See, e.g., Dec. 21, 1987 Hearing: Tr. 104 ("When I approved that Consent Decree, [everybody heard me say] that if everybody in West Dallas wanted to stay there they could do so and those units were not going to be torn down"); Dec. 12, 1988 Hearing: Tr. 170 (DHA attorney referring to "this Court's repeated statement that nothing will be demolished without your specific expressed authority"); Dec. 12, 1988 Hearing: Tr. 195–197 (Court's explanation of this to the Mayor of Dallas).

**37.** The other parties certainly understood that Court approval was required for any demolition of public housing. For example, on Feb. 24, 1987, DHA requested approval for the demolition of two buildings at *Edgar Ward* (with 12 units). And, by letter dated May 1, 1987, the plaintiffs objected to this demolition.

**38.** Because of this holding, it is unnecessary to consider the plaintiffs' objections to HUD's approval of the demolition plan on the grounds that there was no proper environmental impact statement and no proper certification of the demolition plan by the City of Dallas.

**39.** HUD correctly argues that if it "had known that [HUD] could not expect demolition of one West Dallas unit for each [§ 8] unit it provided, it might well have chosen to allocate many of those units to other housing authorities with needs as acute as those of DHA."

**40.** See Consent Decree, 6(C) and (D). Section 6(C) provides: "Actual demolition of any unit shall not start, however, until plaintiffs and DHA agree that a one-for-one replacement of such unit can be reasonably expected to be received from future allocations of funds."

certificates *effective* "one-for-one" replacement units under the Decree—and it was well before the Feb. 8, 1988 date of the Anti–Demolition Statute. Accordingly, the limitations of § 1437p *do not* apply to the 450 § 8 certificates.

### (iv) The 885 § 8 Vouchers

 HUD allocated 450 § 8 vouchers to DHA on March 30, 1987, and allocated another 435 § 8 vouchers on Sept. 20, 1987. However, as discussed in *Walker I*, HUD—relying upon a change in its guidelines—refused to approve the 120% fair market rent exception for § 8 vouchers.

The practical effect of this decision by HUD was to make the § 8 vouchers almost worthless for use in moving people out of minority and low-income impacted areas under the Decree—and forced most of the § 8 tenants who got *vouchers* to remain in minority areas. See *Walker I*, pp. 1239–1240. This made most of the § 8 vouchers *totally ineffective* as "one-for-one" replacement units under the Decree.

Faced with this serious problem, on February 8, 1988, the plaintiffs sought an order which would set a payment standard for § 8 vouchers at 120% of the fair market rent levels. HUD opposed this motion, and evidence concerning this problem was presented at the March 25, 1988 Hearing. Finally, on Aug. 31, 1988—over seven months after Feb. 8, 1988, the date of the Anti–Demolition Statute—HUD reversed its position and approved the 120% fair market rent exception for § 8 vouchers. See *Walker I*, pp. 1239–1240.

However, some of the § 8 vouchers were successfully used—despite their substantial disadvantages—to move black families out of minority areas into non-impacted parts of Dallas and its suburbs. For example, on Jan. 20, 1988—a date near the effective date of the Anti–Demolition statute—DHA had 636 § 8 vouchers and certificates in non-impacted areas.[41] These § 8 vouchers that were in use in non-impacted areas on Feb. 8, 1988 would be *effective* "one-for-one" replacement units under the Decree.[42]

### V. Modification of the Consent Decree

 For the reasons discussed above, the Anti–Demolition Statute does not apply to the demolition of 450 units at West Dallas which were *effectively replaced by § 8 certificates* before the date of this statute (Feb. 5, 1988)—nor does it apply to those additional units at West Dallas that were *effectively replaced by § 8 vouchers used in non-minority areas* before Feb. 5, 1988.[43]

 However, the Anti–Demolition Statute *does apply* to all other housing at West Dallas—including those units that were not *effectively replaced* by § 8 vouchers before Feb. 8, 1988. For this reason, the Consent Decree must be modified to prevent the demolition of these units unless they are replaced with housing or § 8 assistance which meets the requirements of the Anti–Demolition statute.

The change in the law by this statute is circumstance which, in the judgment of this Court, requires modification of the Decree. *Lelsz v. Kaanagh*, 807 F.2d 1243; *System Federation # 91 v. Wright*, 364 U.S. 642, 81 S.Ct. 368. The Decree does prohibit any modifications which impose additional financial obligations upon HUD. Consent Decree, Summary p. 3. Therefore, the specific modifications to be made to the Decree as a result of this opinion will be determined only after a hearing—which will be

---

**41.** DHA First Annual Report, Exh. C (Jan. 20, 1988).

**42.** Of course, those class members who located in non-minority areas with § 8 vouchers only by paying substantially higher rents are entitled to retroactive reimbursement for the additional amounts they paid. See *Walker I*, p. 1240 at fn. 33.

**43.** There is one final problem—*which, of course, occurs in the bedrooms.* The Consent Decree requires that each unit to be demolished must be replaced on a "one-for-one" basis. As the plaintiffs contend, this *does not* permit HUD and DHA to replace two-bedroom units with one-bedroom § 8 units. Therefore, the allocation of § 8 assistance by HUD was deficient by 129 two-bedroom units—and the surplus of one-bedroom units may not be used to cure this deficiency. Dec. 12, 1988 Hearing: Pls. Exhs. 9–11. The Court does not have sufficient evidence to determine whether this problem will have any affect upon the number of West Dallas units that are subject to demolition under this opinion.

held in conjunction with the hearing to determine the modifications that will need to be made to the Decree because of the joinder of the City of Dallas. See *Walker III,* p. 1314.

## VI. <u>Conclusions</u>

The Frost Amendment is unconstitutional—but the Anti–Demolition Statute, 42 U.S.C. § 1437p, is not. Despite the Anti–Demolition Statute, HUD may require demolition to proceed—*in accordance with this Court's approval of the Consent Decree*—with respect to (i) the 550 West Dallas housing units replaced by § 8 certificates and the 100 LRPH units, and (ii) those additional units that were effectively replaced by § 8 vouchers in use in non-minority areas before Feb. 8, 1988. However, because of the Anti–Demolition Statute, no other housing may be demolished at West Dallas unless it is replaced with § 8 assistance or actual "dwelling units" which will be available for at least 15 years.