Debra WALKER, et al.,
Plaintiffs–Appellees,

v.

The UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Defendant–Appellant,

v.

The HOUSING AUTHORITY OF THE CITY OF DALLAS,
Defendant–Appellee.

Nos. 89–1914, 89–1973.

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1990.

Mark W. Pennak, Michael Jay Singer, U.S. Dept. of Justice, Civ. Div., Appellate Staff, Joseph W. LoBue, Office of Gen. Counsel, U.S. Dept. of HUD, Washington, D.C., for defendant-appellant.

Joseph G. Werner, Kathleen McIntosh Beasley, Haynes & Boone, Dallas, Tex., for Housing Authority.

Michael M. Daniel, Elizabeth K. Julian, North Central Texas Legal Services, Inc., Dallas, Tex., for Debra Walker, et al.

Before THORNBERRY, JOHNSON, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

A local public housing agency agreed to demolish certain vacant and uninhabitable units of Dallas public housing in compliance with a consent decree entered by the parties to cure racial housing segregation within the city. The planned demolitions have been stalled indefinitely, however, as a consequence of financing problems. Specifically, the United States Department of Housing and Urban Development (HUD) announced a reduction in the subsidization of vacant units to a level that the local agency claims undermines its efforts to raze the condemned structures. The local public housing agency maintains that both its adherence to the demolition schedule and the consent decree have been thwarted as a result. Sadly, the long-term revitalization of one of Dallas's worst slums has become derailed as local and federal agencies debate their respective fiscal obligations incident to a consent decree.

This civil rights litigation has drawn the attention of Congress, which has enacted two pieces of restrictive housing legislation in the interim. One statute purports to eliminate any federal funding intended to demolish the particular Dallas units slated for destruction by the consent decree; the other restricts federal approval of demolitions. Of particular significance here is the statutory precondition that federally subsidized public housing be replaced on a one-for-one basis for each unit of low-income housing that is demolished.

We are presented with two separate cases, which are consolidated for purposes of this appeal. In the first, HUD challenges court-ordered subsidization of a Dallas public housing agency in regard to vacant units slated for demolition. In the other, HUD maintains that the post-decree legislation that eliminates federal funding for the demolition of the units is not, as the district court held, an unconstitutional breach of the doctrine of separation of powers. Further; HUD asserts that the legislation limiting federal approval of public housing demolitions contemplates only the prospective, not retroactive, application of its restrictive housing replacement features. We vacate in one appeal and reverse in the other.

I.

This housing discrimination case traces back to 1985, when minority participants in low-income housing programs challenged the nonparticipation of Mesquite, Texas, in a federally financed voucher plan to desegregate housing. The complaint was amended to include other Dallas metropolitan suburbs, the Dallas Housing Authority (DHA), and HUD.[1] The putative class, comprised of about 7,200 black households residing in DHA-owned or -managed property and participating in the voucher program, alleged that the defendants historically had administered Dallas's housing assistance programs in a racially discriminatory fashion.

In particular, minority families living in a dilapidated urban housing project, known colloquially as the "West Dallas project," claimed that they were being denied full participation in DHA's "Section 8 Existing Housing Program." This social program is designed to desegregate the racially identifiable Dallas projects through the use of certificates[2] and vouchers.[3] Participants are entitled to select rental housing in more affluent Dallas metropolitan areas and

1. HUD is joined because it provides subsidies to public housing agencies, such as DHA, for the operation of low-income housing units and for other housing assistance to the indigent. *See, e.g.,* 42 U.S.C. §§ 1437c, 1437f, 1437g(a)(1) (West 1978 & Supp.1990).

2. The § 8 certificate program, *see, e.g., id.* § 1437f(b) and 24 C.F.R. pt. 882 (1989), authorizes local public housing agencies to enter into housing assistance payment contracts with private housing owners who lease to low-income

families. The participating family generally is obliged to contribute 30% of its adjusted gross income to its housing needs. HUD aids in financing the balance so that the landlord receives fair market rental.

3. The § 8 voucher program, *see* 42 U.S.C. § 1437f(*o* ), differs from the certificate program in that the participating family locates and selects the unit to be rented within a given geographical area.

thus depart the historically dangerous slums.

To enlist local property owners, HUD is authorized to compensate landlords in the section 8 program at 120% of fair market rental. In this case, HUD agreed to provide such above-market compensation for DHA vouchers and certificates, although the district court concluded that DHA failed to administer this program aggressively. Nevertheless, the section 8 program offers the promise of desegregating housing and alleviating the enormous governmental expense of reconstructing housing for the indigent.

Those suburban communities that agreed to participate in the DHA section 8 program were dismissed from the litigation,[4] leaving the minority plaintiff class, DHA, and HUD. The case never went to trial, however, as the litigants entered into a consent decree *regarding the future of the* West Dallas project.[5] The district court approved the decree as being fair to all parties.

The consent decree recognizes that of the 3,500 West Dallas housing units still standing, approximately 1,300 are vacant and unfit for human habitation because of lead contamination and physical deterioration. The decree also recognizes "an unbroken pattern of purposeful racial segregation and discrimination by DHA dating from the inception of DHA's program to the present day...." Essentially, DHA traditionally had operated its housing program to prevent blacks from moving into white areas of the city, and it purposefully maintained separate, racially identifiable housing projects. HUD, however, disclaims any liability or discriminatory conduct in this matter.

The decree obligated DHA to develop and submit to HUD for approval a comprehensive plan for revitalization of the West Dallas project. The plan accordingly developed by DHA recommends the modernization of 800–900 units with the $18 million of federal funds previously allocated to DHA in 1983 and the demolition of the remaining 2,600 units over a five-year period. The demolition at West Dallas would be coupled with the issuance of a like number of section 8 certificates and vouchers to replace demolished units and to house displaced families.

The anticipated five-phase demolition schedule, it was hoped, would mimic the pace at which substitute housing was made available to class members. By a combination of modernization, certificates and vouchers, and limited construction, all units of West Dallas housing would be replaced on a one-for-one basis. At the time, federal law did not require one-for-one substitution of housing to secure HUD approval for demolitions.

HUD approved DHA's revitalization plan as being in compliance with federal low-income housing laws, *see* 42 U.S.C. §§ 1437 *et seq.* Further, it pledged sufficient federal resources to DHA to provide 1,000 units of additional housing under the revitalization plan, apart from the 800–900 units to be modernized. HUD's commitment translated into the reconstruction of 100 units of public housing—the first such construction to take place in Dallas since the 1950's—and the issuance of 450 units of section 8 certificates and 450 units of section 8 vouchers. All parties recognize that the revitalization plan reflects the fact that no possibility exists of achieving an acceptable physical and social living environment in

---

**4.** The Texas communities dismissed from this housing discrimination case include Carrollton, Plano, Richardson, Mesquite, Irving, Addison, Garland, and Farmers Branch.

**5.** Constructed in the 1950's and located in a historically depressed area, the West Dallas project has a long history of neglect. A substantial portion of the project has been contaminated over the years by lead from an adjacent lead smelter. Since 1980, an average of 1,340 units, or 38% of West Dallas's total, remains

vacant and uninhabitable. In 1987, only about 1,900 black families remained in the project, besieged by drugs and violent crime.

In 1976, DHA secured a $13 million rehabilitative grant for West Dallas, which was drained by incompetence and fraud and resulted in negligible improvement in project quality. In 1983, HUD earmarked $18 million for rehabilitation of the West Dallas project. Today, DHA has yet to receive full disbursement of that grant, as it forms part of the consent decree at issue in this case.

the West Dallas project, absent a massive commitment of about $65–88 million in unavailable resources.

In January 1987, the district court approved the consent decree and the eventual demolition of 2,654 units, after extensive public hearings on the proposed settlement from various interest groups. Approximately eighteen months thereafter, in July or August 1988, HUD announced to DHA that it would drastically reduce, from $124.96 to $50.00 per unit per month, the $1.2–1.5 million "operating subsidy" used to maintain vacant units slated for demolition.

HUD never secured court approval for the reduction in subsidization. Further, it implemented the reduction retroactively for fiscal years 1987 and 1988. The minority plaintiffs responded by filing a motion to restore the deprogrammed units, and DHA filed separately to enforce or modify the decree to restore past levels of subsidization regarding vacant units. The minority plaintiffs contended, and the court agreed, that HUD's reduction in operational subsidies is barred by paragraph 8 of the consent decree, which provides,

> During the implementation of the Decree and Plan, any proposal to sell or otherwise remove from the housing inventory of DHA any housing units, other than as provided in this Decree or as may occur in the normal operations of DHA programs in order to provide office or support staff, will be submitted to the Court for approval to insure that such action will not interfere with implementation of the Decree and Plan. This requirement will cease at such time as DHA is determined, as provided below, to have complied with this Decree. This requirement shall not apply to proposals to modernize, upgrade or redevelop project sites in a manner that does not result in a reduction in the number of units available at the project site.

After a November 1988 hearing, the court admonished HUD for undermining the consent decree. It ordered HUD to pay $1.8 million to DHA, representing the aggregate loss to DHA in federal funding. Alternatively, the court modified the decree to award the same relief, reasoning that it would not have approved the plan absent the annual $1.2–1.5 million operational subsidy from HUD for the vacant units. The court concluded that since DHA has no power to tax, "its ability to comply with the Decree would have been virtually impossible without the operating subsidy from HUD."

The reduced federal subsidization translated into a significant loss of annual revenue to DHA, which complained bitterly that reduced HUD funding frustrates its compliance with the consent decree. HUD responded that its own regulations require reduced subsidization once units become "deprogrammed," i.e., slated for destruction. *See* 24 C.F.R. §§ 990.102, 990.108(b) (1989). A contrary rule, HUD maintains, would create a windfall for public housing agencies, which would be encouraged to delay demolition indefinitely while enjoying the full measure of subsidization associated with programmed (habitable) units. Thus, the drastic reduction ensures that the demolition schedule will be adhered to by the local agency.

HUD appealed the court-ordered subsidization of vacant units to this court, which remanded the cause for an amplification of the court's reasons. The district court subsequently entered its "Further Order with Reasons" in August 1989, coincident with the issuance of a trilogy of opinions focusing upon various aspects of this complicated case.[6] That order, coupled with the accompanying opinions, forms the basis of these two appeals.

Cause No. 89–1973 is before us for the second time. HUD reasserts its basic ar-

---

**6.** *See Walker v. HUD,* 734 F.Supp. 1231 (N.D. Tex.1989) (*"Walker I"*) (DHA's violations of the consent decree and appointment of a special master); *Walker v. HUD,* 734 F.Supp. 1272 (N.D. Tex.1989) (*"Walker II"*) (effect of subsequent federal legislation on consent decree); *Walker v. HUD,* 734 F.Supp. 1289 (N.D.Tex.1989)

(*"Walker III"*) (history of deliberate housing discrimination by DHA and City of Dallas). *See also Baylor v. HUD,* 734 F.Supp. 1314 (N.D.Tex. 1989) (related case), *appeal filed,* No. 89–1880 (5th Cir. argued May 3, 1990). The consent decree is set forth in full as Appendix A to *Walker I,* 734 F.Supp. at 1247–62.

gument that the consent decree contains no binding agreement between DHA and HUD regarding funding and that thus, judicially compelled subsidization is a remedy beyond the scope of the instrument. DHA responds, however, that the parties contemplated full subsidization of vacant units in order to finance the demolitions. Additionally, it argues, the restoration of subsidization falls within the equitable jurisdiction of the court and hence is consistent with the eleventh amendment.

During the course of this acrimonious subsidization controversy, Congress enacted the "Frost Amendment," Pub.L. No. 100–202, 101 Stat. 1329–213 (1987), incident to the passage of a 1988 HUD appropriations bill. Named after its West Dallas congressional sponsor, the amendment proscribes the use of any federal money for the demolition of the West Dallas project.[7] Therefore, although HUD earlier had reserved $2.1 million in federal funds for DHA for the demolition under the Comprehensive Improvement and Assistance Program, 42 U.S.C. § 1437*l* (West Supp.1990), HUD was constrained by the Frost Amendment to withhold all such funds.

The district court was perturbed that Congress would attempt to interfere in this particular case. It held the Frost Amendment to be a blatant legislative intrusion into a pending judicial action, rendering the legislation unconstitutional in light of the doctrine of separation of powers. *Walker II*, 734 F.Supp. at 1283–85. The court directed that past levels of federal funding of vacant units be maintained, as though such units never had been deprogrammed, until the demolition of these units was in fact completed.

Congress injected further uncertainty into this litigation with the enactment of the "Anti–Demolition Statute," 42 U.S.C. § 1437p (West Supp.1990), incident to the passage of the Housing and Community Development Act of 1987, Pub.L. No. 100–

242, 101 Stat. 1815, 1837–39 (1987). That statute mandates that the demolition of public housing may be undertaken only where appropriate "project-based" one-for-one replacement housing of at least a fifteen-year duration is supplied. The statute represents a significant change in public housing law in that, at the time the consent decree was approved, there was no obligation for the government to provide one-for-one replacement as a precondition for demolition. Significantly, HUD understood that the legislation would govern demolition *approvals* after February 5, 1988, the effective date of the legislation.

Significantly, the statute eliminates the use of section 8 vouchers as a form of replacement housing, *see* 42 U.S.C. § 1437p(b)(3)(A)(v), and limits the use of section 8 certificates, *see id.* § 1437p(b)(3)(B). The district court held that the Anti–Demolition Statute, unlike the Frost Amendment, is constitutional, since it operates as a general change in the applicable law. *Walker II*, 734 F.Supp. 1285–86. In its enforcement of the consent decree, the court applied the statute retroactively in part, thus incorporating the statute's restrictive—and expensive—housing substitution features into the decree.

However, the court recognized that a certain number of HUD-approved section 8 vouchers and certificates—those issued before the law's effective date and used to desegregate housing in nonminority areas—had given the federal government a vested property interest in securing a limited number of demolitions. However, the court held that HUD could not compel demolitions for vouchers issued after the effective date or not applied to relocate families from minority areas. *See id.* at 1285–89. Predictably, no demolitions have taken place, despite the considerable passage of years.

DHA does not quarrel with the retroactive application of the Anti–Demolition

---

**7.** This amendment to the Department of Housing and Urban Development—Independent Agencies Appropriations Act, 1988, also withdraws federal funding for the demolition of Houston's Allen Parkway Village housing project, as requested by co-sponsor Rep. Leland:

None of the funds provided by this Act or any other Act for any fiscal year shall be used for demolishing George Loving Place, at 3320 Rupert Street, Edgar Ward Place, at 3901 Holystone, Elmer Scott Place, at 2600 Morris, in Dallas, Texas, or Allen Parkway Village, 1600 Allen Parkway, in Houston, Texas.

Statute, as it would force HUD to finance construction of project-based replacement housing for each unit to be demolished, but without the use of vouchers. HUD objects to any retroactive application of the statute's stringent housing-replacement features, and it claims that such a retroactive application of the intervening legislation is contrary to vested rights for which it bargained. However, HUD urges the constitutionality of the Frost Amendment because it would relieve HUD of any obligation to finance the West Dallas demolition, thus shifting the burden to DHA or the local government. Not surprisingly, the post-decree federal housing legislation that inspired the *Walker II* opinion similarly inspired HUD to commence a separate appeal, No. 89–1914.

## II.

### A.

We must first review our own jurisdiction in this matter, as it has been challenged by DHA and the minority plaintiffs for reasons of mootness. DHA and the plaintiffs concede that HUD has paid $1.8 million in subsidies formerly withheld by the agency, but they insist that no article III case or controversy remains, as the federal government's voluntary compliance with an "injunctive order" moots the review of such an order.

■ We agree with HUD, however, that the district court's interpretation of the contractual obligations of paragraph 8 of the consent decree to require the maintenance of certain levels of subsidization constitutes a "final decision," appealable under 28 U.S.C. § 1291. Indeed, the payment of $1.8 million in compliance with the court's order does not operate to moot the larger

issue here presented, *to-wit,* whether the decree vests the court with authority to compel federal subsidization of vacant housing units.[8] Accordingly, we retain jurisdiction over this appeal.

### B.

■ Consent decrees share sufficient attributes with contracts to be enforced as such. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). Thus, the district court's interpretation of the terms of a consent decree, including whether the decree is ambiguous, is reviewed *de novo.*[9]

■ As a general principle, a consent decree is a product of negotiation and compromise entered into by parties with divergent purposes, but aligned for the simple reason of avoiding costly and protracted litigation. *See United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). The respective obligations of these parties are discerned strictly from within the decree's four corners, as written, and not from the articulated purposes of either party. *Id.* at 682, 91 S.Ct. at 1757.

■ Nor are courts at liberty to redraft the obligations commanded by the decree absent consent of the parties. *See United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932) ("[W]hether right or wrong, [the decree] is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting.") (Cardozo, J.). If the instrument is the product of mistake that would have altered the consent of the parties, vacation of the decree is warranted. *See United States v. Gould,*

8. Alternatively, the court's modification of the consent decree to compel federal subsidization is appealable pursuant to 28 U.S.C. § 1292(a)(1) (modification of injunctive decrees). *Accord Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 572, 104 S.Ct. 2576, 2584, 81 L.Ed.2d 483 (1984) (party to decree cannot invoke the jurisdiction of a federal court to secure a favorable modification of a consent decree and then insulate the modification from appellate review by claiming mootness).

9. *North Shore Lab. Corp. v. Cohen,* 721 F.2d 514, 518 (5th Cir.1983); *see also ITT Continental Baking,* 420 U.S. at 234–35, 95 S.Ct. at 933–34 (consent decree should be construed in its natural sense); *United States v. Atlantic Refining Co.,* 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959) (language of a consent decree given its normal meaning).

301 F.2d 353, 357–58 (5th Cir.1962) (United States entitled to relief from consent decree if land government purchased is found subsequently to be encumbered).

■■■ A consent decree may be judicially modified, over a party's objection, should the instrument reserve the power to modify and articulate the long-term objective to be accomplished.[10] Absent such a reservation, modification remains available where there has been an unforeseen change in circumstances thwarting compliance, such as a change in the controlling substantive law. *See Ruiz v. Lynaugh*, 811 F.2d 856, 860 (5th Cir.1987) (per curiam). However, "[m]odification of a consent decree is not a remedy to be lightly awarded," *id.*, especially where the design is not to relieve a party of obligations but to impose new responsibilities. A contrary rule would discourage compromise for fear of adverse judicial modification.

### C.

Paragraph 8 of the consent decree provides in relevant part that

> [d]uring the implementation of the Decree and Plan, *any proposal to sell or otherwise remove from the housing inventory of DHA any housing units, other than as provided in this Decree* or as may occur in the normal operations of DHA programs in order to provide office or support staff, *will be submitted to the court for approval* to insure that such action will not interfere with implementation of the Decree and Plan.

734 F.Supp. at 1251 (emphasis added). Relying upon this language at the plaintiffs' urging, the court concluded that the reduction in federal subsidization of vacant units operates to "remove housing inventory of DHA" in contravention of the decree. The court reasoned that the West Dallas demolition would be financially impossible absent HUD's $1.2–1.5 million operating sub-

sidy for vacant units. It held that it never would have approved the consent decree if reductions had been contemplated by HUD, and it ordered HUD to continue past levels of funding until such time as the demolitions are completed. *See Walker II*, 734 F.Supp. at 1280.

The court so ruled despite its admission that "[t]here is nothing in the Consent Decree that *requires* the use of HUD funds for the West Dallas demolition; and, the HUD promise that it would 'consider' DHA's request for demolition funds did not constitute a binding agreement." *Id.* n. 22 (emphasis in original). HUD argued to no avail that the reduction is compelled by its regulations, which diminish operational funding for vacant units slated for destruction. The design of such regulations is to prompt the local public housing agency to secure timely demolitions and hence to avoid rewarding procrastination.

■■■ We agree with HUD that court-ordered subsidization is not authorized by the consent decree's plain language. Specifically, paragraph 8 does not require further judicial approval to demolish those West Dallas units already slated to be razed pursuant to the decree's accompanying revitalization plan. The paragraph's plain language imposes a requirement of judicial approval only with respect to demolitions "other than as provided in this Decree." Accordingly, it is silent regarding judicial supervision of those West Dallas demolitions *provided for in the decree.* No party suggests that the demolitions at issue include units not contemplated by the original decree.

We are of the view that the district court gave its approval of the West Dallas demolitions years ago as a consequence of its approval of the decree generally. While the court may have intended to withhold such approval, or to qualify it, judicial intent does not frame the legal dimensions of this decree or expand the court's remedial

---

**10.** *See United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 249–50, 88 S.Ct. 1496, 1499–1500, 20 L.Ed.2d 562 (1968) (parties in antitrust consent decree may petition court to exercise the reserved power of modification in order to remain faithful to decree's goal of increased competition); *Swift*, 286 U.S. at 114, 52 S.Ct. at 462 (power of modification may be reserved).

authority to enforce it.[11] Paragraph 8 only bars the expansion of the demolition program to include other Dallas projects or, perhaps, the 800–900 West Dallas units slated for modernization.

We are similarly unconvinced that reducing operational subsidies for uninhabitable and vacant units is tantamount to the "removal" of such units from DHA's inventory. In truth, the housing inventory remains *unchanged* by the diminished funding, as demolitions have been stalled. Technically, the reduced operating subsidy *preserves* DHA's current inventory, whereas the court-ordered subsidization has the opposite effect of providing the resources needed to raze public housing.

Indeed, paragraph 8 expressly requires the "removal," not the preservation, of housing units from DHA's inventory in order to trigger judicial intervention. We conclude that the district court offered a strained interpretation of DHA's housing "inventory" to infer removal of unauthorized units. That provision neither authorizes judicial supervision of the demolitions approved incident to this decree nor contemplates federal subsidization of vacant units. Accordingly, the decree reserves no authority with the court to order particular levels of funding irrespective of HUD regulations.

While we agree with the court that the reduction may foreclose demolitions as the decree is currently drafted, we are not at liberty to modify the decree to bind HUD involuntarily to additional financial obligations to which, as the court admits, the agency never agreed. *See also Fox v. HUD,* 680 F.2d 315, 320–23 (3d Cir.1982) (consent decree does not obligate HUD to finance development project). Indeed, the decree specifically divests the court of authority to modify HUD's obligations in a manner that would "increase, *alter, or otherwise affect the financial* or other obligations of HUD pursuant to this Decree." (Emphasis added.) Additionally, paragraph 16 states that there shall be "[n]o additional relief or modification" except as provided in the decree.

As was the case in *Fox,* the parties "have not sought enforcement of an existing term, but imposition of an additional term beyond the scope of HUD's consent." *Id.* at 322. If the decree has been frustrated because the parties' respective fiscal obligations were not memorialized in writing, the decree should be vacated, renegotiated and, if impasse persists, the cause scheduled for trial. Since we cannot conclude that the consent decree, as confined by its plain language, has been frustrated as a consequence of reduced subsidies, we remand the case for the district court's more informed view on this matter.

### III.

#### A.

Our jurisdiction to review the district court's invalidation of the Frost Amendment and its retroactive application of the Anti–Demolition Statute to the consent decree has been challenged by the minority plaintiffs and DHA. However, these parties are not consistent in their jurisdictional attacks. The minority plaintiffs, for instance, maintain that the district court's judgment regarding both pieces of housing legislation is neither a final decision under 28 U.S.C. § 1291 nor a modification of an injunction under *id.* § 1292(a)(1).

DHA departs with the minority plaintiffs to a limited extent, conceding that the invalidation of the Frost Amendment is immediately reviewable as a final judgment. However, DHA joins the plaintiff class in arguing that the district court's retroactive application of the Anti–Demolition Statute is not ripe for appellate scrutiny.

■■■ We reject these jurisdictional challenges as being misplaced. It is elementary that the invalidation of an act of Congress is immediately reviewable as a final judgment under section 1291. *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 109 S.Ct. 1726, 1730–31, 104 L.Ed.2d

---

11. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986) ("it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all").

250 (1989) ("Appeals from District Court judgments finding Acts of Congress unconstitutional ... must now be taken to the appropriate Federal Court of Appeals, pursuant to 28 U.S.C. § 1291."). Further, the *Walker II* opinion applied the Anti–Demolition Statute to redefine the number of units of housing that HUD, under the consent decree, could demand to be razed in consideration of the section 8 assistance it provided. *See* 734 F.Supp. at 1286–89. We regard this retroactive application of the legislation to constitute a modification of the consent decree, a view shared by the district court itself. *See id.* at 1288 (section entitled "Modification of the Consent Decree"). The judicial modification amends an injunctive order; thus we retain appellate jurisdiction to review the modification under section 1292(a)(1).

### B.

The Frost Amendment precludes the application of any federal funds for the demolition of certain public housing units, including the West Dallas project. The legislation in no way amends HUD's substantive obligations regarding the administration of federal housing laws and, thus, is strictly appropriational in nature. HUD, which had voluntarily reserved in excess of $2 million for the West Dallas demolition, thereafter declined to disperse any federal funds that could be used, directly or indirectly, to raze the condemned units.

The amendment's sponsors, Reps. Frost (Dallas) and Leland (Houston), bitterly objected to the planned demolitions in their congressional districts. In fact, the primary sponsor conceded that the amendment, attached to a 1988 HUD appropriation bill, "seeks to prohibit [HUD] from expending any money for [the] demolition of 2,600 public housing units in my congressional district in Dallas, TX, or in a specific public housing project in the district of my good friend and colleague, [Rep. Leland]." 133 Cong.Rec. H7742 (daily ed. Sept. 22, 1987) (statement of Rep. Frost).

Since DHA is heavily dependent upon federal financing, the representatives have succeeded in preserving the units from destruction.

The district court protested that the "Frost Amendment is a blatant attempt by Congress to interfere with the ability of this Court to adjudicate a pending case." *Walker II,* 734 F.Supp. at 1283–84. It reasoned that the Frost Amendment, if valid, frustrates the consent decree by effectively prohibiting any demolition in West Dallas, as DHA has no money to pay for this demolition. *See id.* at 1280. The court added that it "would not have approved the Decree if HUD was going to stop paying DHA the ... 'operating subsidy' before the vacant units in West Dallas had been demolished." *Id.*

The district court reviewed the scant legislative history and the unambiguous design of the amendment's sponsors and concluded that the legislation was intended to unravel the consent decree. The court was alarmed by Rep. Frost's indictment of its judicial temperament and by the Congressman's pernicious charge that the court had fulfilled "cynical Reagan administration policies" to generate more homeless people.[12] The court rebuked its congressional critics, retorting that the sponsors seemed more concerned with corralling their public housing constituencies within their voting districts than improving the quality of low-income housing generally. *See id.* at 1283–85 & n. 29.

The district court concluded that the Frost Amendment dictates the outcome of a pending judicial action and thus violates the separation created by the Constitution between Congress and the judiciary. *Id.* at 1285. Citing the amendment's legislative history, it viewed the law as being narrowly tailored to amend or thwart the consent decree legislatively. The court held that a long line of Supreme Court cases, tracing back to *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), and *Murray's Lessee v. Hoboken*

---

12. *See* 133 Cong.Rec. H7774 (daily ed. Sept. 22, 1987) (statement of Rep. Frost) ("What we have is a cynical action by the Reagan administration to eliminate one-third of the public housing units in Dallas at a time when the problem of the homeless is increasing and at a time when there is an increasing number of poor people in the seventh largest city of the United States.").

*Land & Improvement Co.*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855), direct invalidation of this intrusive legislation. 734 F.Supp. at 1282.

■ We agree with the district court that *Klein* instructs that Congress cannot prescribe a rule of decision in a case pending before the courts so as to decide a matter as Congress would like. *See United States v. Sioux Nation of Indians*, 448 U.S. 371, 404, 100 S.Ct. 2716, 2735, 65 L.Ed.2d 844 (1980). However, *Klein* does not stand for the proposition that *any* attempt by Congress to affect a pending case is unconstitutional. Indeed, if a court "is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons." *Mistretta v. United States*, 488 U.S. 361, 384, 109 S.Ct. 647, 661, 102 L.Ed.2d 714 (1989) (quoting *Bowsher v. Synar*, 478 U.S. 714, 736, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986)).

■ We adhere to the well-settled principle of statutory construction that legislation should be construed narrowly to avoid invalidation unless such a construction is plainly contrary to the intent of Congress.[13] This maxim is particularly important regarding legislative appropriations, since the Constitution vests Congress with plenary power to disperse or withhold federal money.[14] It is also axiomatic that Congress is not presumed to have usurped power constitutionally forbidden it or to have intended to impinge upon constitutionally protected liberties.[15]

■ In this case, HUD argues that the Frost Amendment eliminates only federal funding of the West Dallas demolition, not state or local financing. Significantly, the amendment does not preclude demolitions generally or reverse HUD's *approval* of the demolitions. We agree. Regardless of the sponsor's obvious motivation to derail demolitions, the legislation only withdraws federal appropriations.

The amendment does not, as the court suggests, *ban* the razing of West Dallas's public housing. We recognize that the Frost Amendment has stalled West Dallas's revitalization, but such a result does not authorize courts to invalidate the decisions of Congress in regard to appropriations. We are persuaded that the decree and the amendment do not conflict sufficiently to estop Congress from exercising its power under the appropriations clause.

■ With limited exceptions, Congress's actions on appropriations are not subject to judicial invalidation.[16] The Supreme Court has stated that "[a]ny exercise of a power granted by the Constitution to one of the other Branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Office of Personnel Management v. Richmond*, — U.S. —, 110 S.Ct. 2465, 2472, 110 L.Ed.2d 387 (1990). Thus, the misrepresentations of executive branch

---

13. *See DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality") (quoting *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895)); *accord United States v. Monsanto*, — U.S. —, 109 S.Ct. 2657, 2664, 105 L.Ed.2d 512 (1989); *Public Citizen v. United States Dep't of Justice*, — U.S. —, 109 S.Ct. 2558, 2572, 105 L.Ed.2d 377 (1989).

14. U.S. Const., art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). *Accord Reeside v. Walker*, 52 U.S. (11 How.) 272, 291, 13 L.Ed. 693 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned.").

15. *See DeBartolo Corp.*, 485 U.S. at 575, 108 S.Ct. at 1397; *accord NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533 (1979); *United States v. Security Indus. Bank*, 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982).

16. The Constitution, for example, bars Congress from diminishing judicial compensation, U.S. Const. art. III, § 1, or adjusting presidential compensation during an elected term, *id.* art. II, § 1, cl. 7. But neither DHA nor the minority plaintiffs enjoy a constitutional right to have vacant and uninhabitable government housing destroyed.

employees do not impose a lien on the treasury in favor of private citizens under an estoppel theory. *Id.* 110 S.Ct. at 2476.

■ Nor does the President's pardoning power override the appropriations clause and allow the president to direct disbursements. *Knote v. United States*, 95 U.S. (5 Otto) 149, 154, 24 L.Ed. 442 (1877) ("Moneys once in the Treasury can only be withdrawn by an appropriation by law."). Courts of equity are no exception to the rule that disbursements from the United States Treasury first must be authorized by a congressional appropriation. *See INS v. Pangilinan*, 486 U.S. 875, 883, 108 S.Ct. 2210, 2216, 100 L.Ed.2d 882 (1988) ("Courts of equity can no more disregard statutory and constitutional requirements than can courts of law") (quoting *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S.Ct. 71, 74, 37 L.Ed. 1044 (1893)).

Further, the controversial remarks of the congressional sponsors do not render this appropriations amendment unconstitutional. While the remarks arguably evince a wish to direct an outcome that Congress deems favorable, the amendment falls short of dictating the judicial result. The demolitions remain possible, albeit without federal funding. Moreover, the sponsors' charged rhetoric is not necessarily reflected in the text of the statute.

Had Congress attempted to vacate the decree or ban West Dallas demolitions entirely, we might agree with the district court that Congress had usurped power constitutionally forbidden it. However, it selected the more sober approach of registering dissatisfaction by withdrawing federal funding. We conclude that if, as here, no *constitutionally protected* interest is implicated by the reduced federal funding, the Constitution confers on Congress the authority under the appropriations clause to withdraw financial support of this demolition.

Had a burgeoning federal deficit inspired the Frost Amendment, no one disputes that Congress retains the constitutional authority to slash HUD appropriations earmarked for low-income housing. The parties have no constitutionally protected interest in continued subsidization, nor is Congress estopped from exercising its appropriations power once litigation commences. Thus, the motive of the sponsors, while arguably relevant if the legislation had banned demolitions generally, does not change the constitutional nature of the enactment in this case.

Absent legislation that matches the congressional rhetoric to direct pending litigation in its favor, we decline to invalidate congressional appropriations or the lack thereof. Significantly, the elimination of federal funding for the West Dallas demolitions does not legislatively *dictate* the outcome of this case. *Accord National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455, 465–66 (D.C.Cir.1984) (per curiam) (elimination of federal funding does not necessarily direct the outcome of pending lawsuits in favor of the government). Accordingly, we hold the Frost Amendment to be constitutionally sound.

### C.

The Anti–Demolition Statute is broader, imposing restrictive preconditions upon HUD for the *approval* of public housing demolitions. Of particular significance to this case is the feature that substitute housing, preferably project-based, must be supplied on a one-for-one basis for each unit razed. 42 U.S.C. § 1437p(b)(3). Additionally, section 8 vouchers no longer qualify as a substitute for project-based housing. *Id.* § 1437p(b)(3)(A)(v).

HUD's approval of the West Dallas demolition predates the statute's effective date. Nevertheless, the district court applied the statute retroactively in part, to modify the number of West Dallas units that possibly could be demolished without compliance with the new legislation. The court conceded that it would be "manifestly unjust" to apply the statute strictly and thereby deny HUD the benefit of *all* demolitions that it bargained for through the issuance of certificates and vouchers. *See Walker II*, 734 F.Supp. at 1287.

Accordingly, the court held that the Anti–Demolition Statute applies retroactively to impose new demolition restrictions only upon those West Dallas housing units not "effectively replaced" by section 8

vouchers before the law's effective date. *Id.* at 1288. A section 8 voucher "effectively replaced" a housing unit, the court reasoned, if the holder used the voucher to move into a "non-minority area," as distinguished from a racially identifiable project. *Id.* Consequently, by the court's logic, a significant number of housing units were never effectively replaced.[17]

The court held that the Anti–Demolition Statute, unlike the Frost Amendment, is a general change in the law and thus constitutional. *Id.* at 1285. It dismissed HUD's "technical arguments" for prospective application and concluded that "it is apparent that this statute ... was intended to apply retroactively to pending cases." *Id.* But no statutory language is cited by the court to support retroactive application; instead, it asserts that retroactivity "is supported to some degree by the scant legislative history." *Id.*

As a general proposition, the law disfavors retroactivity. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). Indeed, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.; accord Bennett v. New Jersey,* 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985) ("statutes affecting substantive rights and liabilities are presumed to have only prospective effect").

The district court apparently overlooked *Bowen* and instead applied the language of *Bradley v. Richmond School Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), which instructs that "a court is to apply the law in effect at the time it renders its *decision,* unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." (Emphasis added.) Significantly, however, *Bradley* expresses no presumption of statutory retroactivity; rather, it binds courts, with some exceptions, to apply legislation enacted while cases are

pending *decision,* not those already decided or those, as here, that may evade decision completely.

In brief, *Bradley* does not contemplate situations in which there has been no adjudication on the merits of the controversy. The court's approval of the consent decree in this case is not equivalent to a "decision" on the merits of the action. As is true generally with consent decrees, judicial action is limited to whether the compromise forged by the parties is fair to all. Consequently, we conclude that *Bradley* does not control this case. That being so, the district court's preoccupation with calculating the number of units of West Dallas housing "effectively replaced" by certificates and vouchers in non-minority areas is inapposite.

Assuming *arguendo* that the consent decree constitutes a judicial "decision," the district court is bound in this case by the law as it exists upon *approval* of the decree (i.e., the time of decision), not by subsequent amendments in the substantive law enacted months thereafter. This pre-amendment approval/post-amendment demolition problem has confronted HUD before. In *Project BASIC v. O'Rourke,* 907 F.2d 1242, 1244–45 (1st Cir.1990), the court held that the Anti–Demolition Statute does not apply to HUD *approvals* predating the amendment. According, the restrictive features of the amendment may not interfere with post-amendment demolitions, even if such demolitions are not yet completed or begun by the local public housing agency, provided that such demolitions were approved prior to the subject amendment.

We find the First Circuit's logic to be persuasive and consistent with Supreme Court precedent, and we decline to create a split between circuits on this issue. A contrary rule would have the perverse effect of modifying the obligations of HUD for demolitions partially or totally completed. We join with the First Circuit in holding that nothing in the statute commands such an onerous result.

**17.** Of the 1,335 § 8 certificates and vouchers ultimately issued by HUD to replace West Dallas housing, the agency estimates that it could secure the demolition of approximately 636 hous-

ing units as a consequence of the court's retroactive interpretation of the Anti–Demolition Statute and incorporation of an "effective replacement" requirement.

832

Our conclusion is reinforced by *Bennett v. New Jersey*, which held that "practical considerations related to the administration of federal grant programs imply that obligations generally should be determined by reference to the law in effect when the grants were made." 470 U.S. at 638, 105 S.Ct. at 1559. This logic extends to the obligations borne by HUD incident to its approval of a federally subsidized housing or demolition plan. Accordingly, the enactment of the Anti–Demolition Statute does not retroactively modify the consent decree in this case.

### IV.

In summary, we VACATE the judgment and REMAND in No. 89–1973 for renegotiation, trial, and/or other proceedings consistent herewith. We REVERSE the judgment in 89–1914 regarding the unconstitutionality of the Frost Amendment and the retroactive effect of the Anti–Demolition Statute upon previously approved demolitions, and we likewise REMAND that cause for further appropriate proceedings.