# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 17, 2021

Lyle W. Cayce
Clerk

No. 20-30734

Anthony Allen; Stephanie Anthony; Louisiana State Conference of the NAACP,

*Plaintiffs—Appellees*,

*versus*

State of Louisiana; R. Kyle Ardoin, *Secretary of State of Louisiana in his official capacity*,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 19-CV-479

Before Davis, Duncan, and Oldham, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

Three decades ago, a federal consent decree—the "*Chisom* decree"—created Louisiana's one majority-black supreme court district. In this appeal, we are asked whether that decree also governs the other six districts. The answer is no.

The district court therefore rightly denied Louisiana's motion to dismiss this Voting Rights Act suit for lack of jurisdiction. The state argued that the *Chisom* decree centralizes perpetual federal control over all supreme

No. 20-30734

court districts in the Eastern District of Louisiana, which issued the decree. The district court rejected that reading for good reason: it is plainly wrong.

Louisiana would inflate the *Chisom* decree beyond its terms and the lawsuit that spawned it. The present suit, however, addresses a different electoral district untouched by the decree. So, even assuming the decree still lives after all these years—something we are not asked to decide—it could not oust the district court's jurisdiction over this case. This being a certified appeal, we decide that and nothing more.

The certified order is AFFIRMED.

## I.

The seven members of the Louisiana Supreme Court are currently elected from these seven single-member districts:



No. 20-30734

*See* La. S. Ct., *Maps of Judicial Districts*, https://www.lasc.org/About/ MapsofJudicialDistricts (last visited Aug. 24, 2021).

Plaintiffs claim this system unlawfully dilutes black votes. So, in 2019 they sued in the Middle District of Louisiana under section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10101 *et seq.* ("VRA").[1] *See generally Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330–33 (2021). They allege Louisiana's demography would support two majority-black districts. But Louisiana has only one—District 7—created as a result of the "*Chisom* decree," a 1992 consent decree arising out of prior VRA litigation.[2] Plaintiffs thus seek to create a second majority-black district, alleging it could be drawn in District 5, which includes East Baton Rouge Parish and surrounding parishes.

Louisiana moved to dismiss for lack of subject-matter jurisdiction. It argued that, due to the *Chisom* decree's continuing operation, only the Eastern District of Louisiana has "subject matter jurisdiction over cases involving Louisiana's Supreme Court districts." The district court disagreed for two reasons. Principally, it ruled that Plaintiffs' only aim is to redraw District 5 and so their suit "falls outside the jurisdiction of the *Chisom* [decree]," which concerned only the new district—District 7—spawned by the *Chisom* litigation. Alternatively, even granting Louisiana's premise that this suit "collaterally attacks" the decree, the court ruled Plaintiffs could

[1] The plaintiffs are the Louisiana State Conference of the NAACP and two black Louisianans who reside in East Baton Rouge Parish. The defendants are the State of Louisiana and the Louisiana Secretary of State, R. Kyle Ardoin, in his official capacity. We refer to the plaintiffs collectively as "Plaintiffs" and the defendants collectively as "Louisiana" or "state."

[2] *See Chisom v. Roemer*, 501 U.S. 380, 384–90 (1991); *Chisom v. Jindal*, 890 F. Supp. 2d 696, 702 (E.D. La. 2012); *Perschall v. State*, 96-0322 (La. 7/1/97), 697 So. 2d 240, 243–247 (all discussing litigation and decree); *see also infra* III.A (same).

bring such an attack. The court reasoned that, under *Martin v. Wilks*, 490 U.S. 755 (1989), "non-parties to a consent decree can in fact bring a separate action challenging that decree except in certain narrow exceptions" not relevant here.[3]

The district court then granted Louisiana's motion for interlocutory appeal.[4] The court stated that its order denying Louisiana's motion to dismiss presented this controlling question of law: "[W]hether the Eastern District [of Louisiana] has exclusive subject-matter jurisdiction over all matters involving Louisiana Supreme Court districts under the [*Chisom* decree]." We accepted the appeal. *See* 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a).

## II.

The issues before us are all subject to *de novo* review. Certified orders are reviewed *de novo*, *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1035 (5th Cir. 2016), as is a district court's ruling on subject-matter jurisdiction, *Laufer v. Mann Hospitality, L.L.C.*, 996 F.3d 269, 271 (5th Cir. 2021). And a "district court's interpretation of the terms of a consent decree . . . is reviewed *de novo*." *Walker v. U.S. Dep't of Hous. & Urb. Dev.*, 912 F.2d 819, 825 (5th Cir. 1990); *see also Frew v. Janek*, 820 F.3d 715, 723 (5th Cir. 2016) (same).

---

[3] The court also rejected Louisiana's arguments that Plaintiffs lack standing and that *Chisom v. Roemer*—which applied the VRA to state judicial elections, 501 U.S. at 404—is no longer good law. Those issues are not before us. Louisiana also moved to transfer venue to the Eastern District of Louisiana. The district court denied this motion "without prejudice, subject to refiling, if necessary, after the Fifth Circuit renders a decision on [Louisiana's] interlocutory appeal[.]"

[4] The court denied Louisiana's motion for stay pending appeal. Louisiana did not seek a similar stay from our court.

No. 20-30734

## III.

The district court ruled that its jurisdiction over Plaintiffs' suit was undisturbed by the *Chisom* decree, which principally concerned a different electoral district from the one at issue here. We agree and affirm on that basis. So, we need not reach the court's alternative holding that Plaintiffs can collaterally attack the decree. To explain our decision, we first sketch the decree's origins. Then we explain why the decree, assuming it is still in force, does not oust the district court of jurisdiction over this case.

## A.

The *Chisom* decree arose out of a 1986 class action challenging the prior system for electing the Louisiana Supreme Court.[5] Five justices were elected from five single-member districts; the other two were elected from a single at-large district (the "First Supreme Court District") that encompassed four parishes—Orleans, Jefferson, St. Bernard, and Plaquemines. *See* La. Rev. Stat. § 13:101 (1975). The suit was brought under the VRA on behalf of black Orleans Parish voters, who claimed the at-large district unlawfully diluted black votes in majority-black Orleans Parish.

After years of litigation, the parties entered into the 1992 *Chisom* decree contingent on the state legislature's enacting Act 512, which occurred that same year. The decree did the following. First, it created a new supreme court district "comprised solely of Orleans Parish," from which a new justice would be elected when a vacancy opened in the at-large district. Second, the decree created a temporary "*Chisom* seat" on the supreme court; this seat would be filled by an eighth justice—drawn from a new slot on the Louisiana Fourth Circuit—who would serve in rotation with the other justices. The

---

[5] A more detailed discussion appears in *Chisom*, 890 F. Supp. 2d at 702–07.

5

*Chisom* seat would expire, however, upon the seating of a justice elected from the newly-created Orleans Parish district. Third, the decree called for legislative "reapportionment of the seven districts of the Louisiana Supreme Court." Specifically, "[t]he reapportionment [would] provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety," effective January 1, 2000. This last task was accomplished in 1997 when Act 776 created a seven district map which included a new majority-black district—the present District 7—encompassing almost all of Orleans Parish.[6] (That map, which remains in effect today, is reprinted above). Finally, the *Chisom* decree provided the Eastern District "shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished."

In 2012, federal litigation arose over the decree. The dispute concerned the tenure of then-Justice Bernette Johnson, who had been elected to the *Chisom* seat in 1994 and to the District 7 seat in 2000. *See Chisom v. Jindal,* 890 F. Supp. 2d 696, 707 & n.27 (E.D. La. 2012). Interpreting the decree, the Eastern District ruled Justice Johnson was to be fully credited for her service since 1994, resulting in her elevation to the position of Chief Justice. *Id.* at 728. The court rejected Louisiana's argument that it lacked jurisdiction to interpret the decree. To the contrary, the court ruled there had been no "affirmative ruling" terminating the decree, "nor . . . any request that this be done." *Id.* at 711. It also found that the decree's "final remedy" had not been accomplished yet and that the court therefore had "continuing jurisdiction and power to interpret the [decree]" to settle Justice Johnson's

---

[6] Act 776 did not perfectly comply with the *Chisom* decree because the new District 7 "was not the entirety of Orleans Parish." *Chisom,* 890 F. Supp. 2d at 706. But the parties successfully moved to modify the decree to incorporate Act 776 as an "addendum." *Ibid.*

tenure. *Ibid.* The court "expressly retain[ed] jurisdiction over th[e] case until that final remedy is implemented." *Ibid.*

**B.**

On appeal, Louisiana argues the district court read the *Chisom* decree too narrowly. According to the state, the decree's "four corners" encompass all seven supreme court districts, not just District 7. This means, we are told, that the decades-old decree "dictat[es] the perpetuation of the redistricting finalized by the Louisiana Legislature in 1997" and "constitutes a continuing injunction with respect to the seven Louisiana Supreme Court districts . . . under the exclusive jurisdiction of the Eastern District Court." Accordingly, by seeking to redraw District 5, Louisiana contends Plaintiffs are asking the district court to exceed its jurisdiction and "modify the orders" of another district. The district court disagreed, reading the *Chisom* decree to affect only the existing majority-black district in Orleans Parish. On that view, Plaintiffs' suit "falls outside the [decree's] jurisdiction" because it addressed only District 5. We agree with the district court.

"Consent decrees are hybrid creatures, part contract and part judicial decree." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018) (citation omitted). They are interpreted "according to general principles of contract law." *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (cleaned up); *accord United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975). We consult the contract law of the relevant state, here Louisiana.[7] *See* LA. CIV. CODE art. 2045 *et seq.* Under Louisiana law, courts seek the parties' common intent starting with the contract's words, which control if they are

---

[7] *See, e.g.*, *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) ("We look to state law to provide the rules of contract interpretation."); *see also Frew*, 780 F.3d at 327 n.28 (noting our court has "previously applied Texas law in cases involving consent decrees concluded between Texas parties" (citations omitted)).

clear and lead to no absurdities. *See* La. Civ. Code arts. 2045, 2046. "Furthermore, a contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." *Baldwin v. Bd. of Sup'rs for Univ. of La. Sys.*, 2014-0827, p. 7 (La. 10/15/14), 156 So. 3d 33, 38 (citing La. Civ. Code art. 2050). When a contract resolves a lawsuit, it "extends only to those matters the parties intended to settle and the scope of the transaction cannot be extended by implication." *Trahan v. Coca Cola Bottling Co. United, Inc.*, 2004-0100, p. 15 (La. 3/2/05), 894 So. 2d 1096, 1107 (citing La. Civ. Code art. 3073; *Ortego v. State, Dept. of Transp. & Dev.*, 96-1322, p. 7 (La. 2/25/97), 689 So. 2d 1358, 1363; *Brown v. Drillers, Inc.*, 93-1019, p. 8 (La. 1/14/94), 630 So. 2d 741, 748). Such a contract "must be considered as a whole and in light of attending events and circumstances." *Ibid.*; *see also* La. Civ. Code art. 3076 ("A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express.").

The district court's construal of the *Chisom* decree follows these principles. The court first looked to the decree's four corners and read it holistically. *See* La. Civ. Code arts. 2045, 2050. As the court observed, "most of the preamble" and the "great majority" of the decree "are devoted almost entirely to the creation of the Supreme Court district in Orleans Parish and the operation of its new justice." That is correct. The decree's preamble frames it as addressing only the "multimember First Supreme Court district," and the decree addresses step-by-step how that district is to be converted into today's majority-black District 7. Thus, properly read in context, the decree's references to "the system for electing the Louisiana Supreme Court" or to the "restructuring of the Supreme Court of Louisiana," point to converting the one at-large district into the present-day majority-black district. Those references do not, as Louisiana argues, mean the decree overhauled all supreme court electoral districts.

Furthermore, the district court also properly read the decree in light of the 1986 lawsuit it settled. *See* La. Civ. Code arts. 3073, 3076; *Trahan*, 894 So. 2d at 1107. As the court explained, *Chisom* was "a class action suit on behalf of all blacks registered to vote in Orleans Parish," claiming their votes were diluted by the then-existing First District. *See Chisom*, 890 F. Supp. 2d at 702. The *Chisom* decree sought to remedy that alleged defect by creating the interim *Chisom* seat and the present-day District 7. *Id.* at 704–06. Indeed, the decree is explicitly framed in terms of the "*Chisom* plaintiffs[']" claim that the "multi-member district system . . . in the First Supreme Court District . . . dilutes black voting strength" in violation of the VRA. The district court was therefore correct that the scope of the *Chisom* suit illuminates the scope of the decree, showing it has nothing to do with the present case.

In response, Louisiana points to the decree's calling for "reapportionment of *the seven districts* of the Louisiana Supreme Court." But Louisiana misses the context of that statement. The next sentence specifies that "[t]he reapportionment will provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety." So, while the decree does reference the anticipated restructuring of all districts, its focus is on the one majority-black district—today's District 7—sought by the *Chisom* suit. That suit had nothing to do with the other districts and, accordingly, the decree has nothing to say about how they are to be apportioned. Louisiana's squinting at one statement in the decree ignores the rule that "[o]ne provision of a contract should not be construed separately at the expense of disregarding other provisions." *Baldwin*, 156 So.

No. 20-30734

3d at 38 (citing *Sims v. Mulhearn Funeral Home, Inc.*, 07-0054, p. 8 (La. 5/22/07), 956 So. 2d 583, 589; LA. CIV. CODE art. 2050).[8]

Louisiana next focuses on the decree's statement that "future Supreme Court elections . . . shall take place in the newly reapportioned districts." From this, Louisiana draws the conclusion that the decree "dictat[es] the perpetuation" of the entire 1997 redistricting, vesting the Eastern District with "exclusive jurisdiction" over "*all future* elections" in all "seven Louisiana Supreme Court districts" (emphasis in brief).

This overreads the decree extravagantly. Louisiana forgets "the inherent limitation upon federal judicial authority" that "federal-court decrees must directly address and relate to the constitutional violation itself." *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 247 (1991) (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). The violation alleged in *Chisom* was vote dilution in the at-large district, not in the other five single-member districts or statewide. The decree was tailored to remedy that violation. But Louisiana wants us to read the decree as "perpetuat[ing]" federal control over *all* elections in *all* districts. That we cannot do. Even if the decree supported Louisiana's maximalist reading (it does not, *see supra*), a federal consent decree cannot manacle a state's entire judicial election system based on an alleged violation in *one* district. A federal court would lack authority to enter such a decree, even if the parties asked it to.[9] So, we reject

---

[8] *See also Frew*, 780 F.3d at 328 (observing "courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section" (citation omitted)); *id.* at 329 (warning that a "results-oriented" assessment based on isolated language "would be wholly inconsistent with the rules of contract interpretation")

[9] *See, e.g.*, *Milliken*, 433 U.S. at 282 (explaining "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution . . . or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation" (citations omitted)); *see also Horne v. Flores*,

Louisiana's argument that the *Chisom* decree extends continuing federal judicial control over every election in every supreme court district.

In light of that, we are puzzled by Louisiana's invoking "federalism concerns" to support its argument. Louisiana's brief asserts that "federalism concerns are significantly heightened" when litigants use federal courts to "maintain injunctive oversight of a state's sovereign functions." Yet, on the next page, Louisiana tells us that it entered into the *Chisom* decree "to avoid further litigation over supreme court districts" and that the decree "is binding upon [Louisiana] *in perpetuity* unless and until [the Eastern District] says otherwise" (emphasis added). That is both wrong and baffling. Wrong, because federal "consent decrees are 'not intended to operate in perpetuity.'" *Guajardo v. Tex. Dep't of Crim. Justice*, 363 F.3d 392, 394 (5th Cir. 2004) (quoting *Dowell*, 498 U.S. at 237). Baffling, because a state does not champion "federalism" by trying to consign its supreme court elections to perpetual federal supervision.

It is of course true that "institutional reform injunctions often raise sensitive federalism concerns," as they frequently "involve[] areas of core state responsibility." *Horne*, 557 U.S. at 448; *see also M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) (observing, for the same reason, that "institutional reform injunctions are disfavored" (citing *Horne*, 557 U.S. at 448)). But federalism is protected, not by overextending such injunctions, but by confining them to their proper scope.[10] We do so here. The *Chisom*

---

557 U.S. 433, 450 (2009); *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) (both making the same point).

[10] *See, e.g.*, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) ("If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers" and "may also lead to federal-court oversight of state programs for long periods of time even absent an ongoing violation of federal

decree aimed to remedy alleged vote dilution in one supreme court district, not to reform the whole system. The present suit challenges a different part of that system the decree does not touch. The Eastern District's continuing jurisdiction to enforce the decree, whatever that amounts to, thus presents no jurisdictional impediment to the Middle District's hearing Plaintiffs' suit.

Finally, Louisiana insists that—should Plaintiffs win—any remedy would inevitably conflict with the *Chisom* decree, putting the state "in the absurd position of having to disregard one court's orders to comply with another court's orders." We disagree. Louisiana's argument again depends on its misreading the decree to control all seven districts. As explained, though, the decree substantively addressed only the eventual District 7. And even assuming some *possible* conflict between District 7 and a remedy in District 5, Louisiana cites no case showing such a possibility implicates a court's subject matter jurisdiction. It only cites cases teaching that "comity" counsels one court to avoid interfering with another's jurisdiction.[11] To be sure, if a proposed new district in this case sought to incorporate precincts in District 7, comity issues would obviously arise. But this interlocutory appeal involves subject-matter jurisdiction, not comity, and so the cases Louisiana cites are inapposite.

---

law."); *Horne*, 557 U.S. at 449 ("Where state and local officials inherit overbroad or outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents, they are constrained in their ability to fulfill their duties as democratically-elected officials." (cleaned up)).

[11] *See Brittingham v. Comm'r of Internal Revenue*, 451 F.2d 315, 318 (5th Cir. 1971) ("[C]omity dictates that courts of coordinate jurisdiction not review, enjoin or otherwise interfere with one another's jurisdiction."); *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971) (in light of "comity and the orderly administration of justice," a court should decline jurisdiction over a case that would "interfere[] with or usurp[]" another court's jurisdiction).

To these problems with Louisiana's argument, we add a more fundamental one: Louisiana "assume[s]" the three-decades-old *Chisom* decree is still in force, yet fails to explain why. The state's brief says only that the Eastern District "never relinquished jurisdiction" over *Chisom*; that, in the 2012 litigation over Justice Johnson's tenure, the court "disagreed" with Louisiana that the decree had lapsed; and that Louisiana is consequently "left no other option" than to "assume . . . [the] [d]ecree is still in effect today." That is weak sauce.

Louisiana's argument glosses over what the Eastern District actually said in its 2012 order. The court interpreted the *Chisom* decree to give Justice Johnson tenure back to 1994. *Chisom*, 890 F. Supp. 2d at 711. So, it found the final remedy "has not *yet* been implemented" and retained jurisdiction "*until* that final remedy is implemented." *Ibid.* (emphases added). Since then nearly ten years have passed. In that time, Justice Johnson became Chief Justice and has now retired.[12] In light of those developments, one might think the decree's final remedy has been implemented. But Louisiana has evidently never asked the Eastern District to vacate the decree.

In any event, we need not decide that question. Even assuming the *Chisom* decree still lives, it does not touch Plaintiffs' VRA suit. So, the district court correctly ruled the decree did not oust it of jurisdiction. That is the only issue we decide today. We express no opinion on the merits of Plaintiffs' suit or on any other matter pending before the district court.

---

[12] *See* LA. S. CT., *Biography of Associate Justice Piper D. Griffin*, https://www.lasc.org/About/Biography?p=Piper_D._Griffin (last visited Aug. 24, 2021) (reporting Justice Griffin's 2020 election to the District 7 seat, "following in the footsteps of Chief Justice Bernette J. Johnson and Justice Revius Ortique").

No. 20-30734

## IV.

The certified order is AFFIRMED.

No. 20-30734

Andrew S. Oldham, *Circuit Judge*, concurring in the judgment:

In 2019, plaintiffs sued under the Voting Rights Act in the United States District Court for the Middle District of Louisiana. It's undisputed that plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States" and hence the district court had subject matter jurisdiction under 28 U.S.C. § 1331. It's also undisputed that Louisiana has no jurisdictional defenses that sound in the Constitution, laws, or treaties of the United States. The only question is whether a 29-year-old *consent decree* can somehow strip the district court of the jurisdiction conferred by Congress. Much has been written about the perniciousness of consent decrees.[*] But I am unaware of any authority from any source that suggests a consent decree—even in its most pernicious manifestation—can undo the

---

[*] *See, e.g.*, *Horne v. Flores*, 557 U.S. 443, 449 (2009) (Consent decrees may improperly "bind state and local officials to the policy preferences of their predecessors."); *Frew ex. rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) ("If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers."); Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change*, 1987 U. Chi. Legal F. 295, 297 (1987) ("To the extent that consent decrees insulate today's policy decisions from review and modification by tomorrow's political processes, they violate the democratic structure of government."); *id.* at 317 ("[C]onsent decrees can enable officials to transgress limits on their authority or sidestep political checks and balances."); Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. Chi. Legal F. 103, 128 (1987) (proposing that "courts should refuse to approve any consent decree that limits the arguable legal rights of some [third party] whose existence is known or foreseeable," because "entry of the consent decree commits the court against the rights of [the third party] in a way unlikely to be undone in any attempt at de novo litigation"); *id.* at 132 ("The consent decree allows *A* and *B* to avoid responsibility for the harm they inflict on *C*; it provides the legitimacy of a judicial decision without the reality of a judicial decision."); *id.* at 133 ("[M]ost consent decrees reflect no judgment of any government official. *A* and *B* draft and approve the decree; court approval is a mere rubber stamp."); Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 Duke L.J. 1265, 1294–95 (1983) ("Nominal defendants are sometimes happy to be sued and happier still to lose.").

No. 20-30734

jurisdiction that Congress conferred. The order denying Louisiana's motion to dismiss should be affirmed for that reason.